## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **METROMONT CORPORATION** | * | |
| **Plaintiff/Counter-Defendant,** | * | |
| **v.** | * | **Case No.: 1:18-CV-03928-DKC** |
| **ALLAN MYERS, L.P.** | * | |
| **Defendant/Counter-Plaintiff,** | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

| | | |
|---|---|---|
| **ALLAN MYERS, L.P.** | * | |
| **Third-Party Plaintiff,** | * | |
| **v.** | * | |
| **TRAVELERS CASUALTY & SURETY COMPANY OF AMERICA** | * | |
| | * | |
| **Third-Party Defendant.** | * | |

\*    \*    \*    \*    \*    \*    \*         \*    \*    \*    \*    \*

### ALLAN MYERS, L.P.'S MOTION FOR PARTIAL SUMMARY JUDGMENT, INCORPORATED MEMORANDUM OF LAW AND REQUEST FOR HEARING

COMES NOW the Counter-Plaintiff, Allan Myers, L.P. ("Myers"), by and through its undersigned counsel, pursuant to Fed. R. Civ. P. 56, and hereby moves this Honorable Court for the entry of partial summary judgment in its favor and against Counter-Defendant Metromont Corporation ("Metromont") and Third-Party Defendant Travelers Casualty & Surety Company of America ("Travelers"), and in support, respectfully states as follows:

### I. INTRODUCTION

There is absolutely no question that there exists no "material" facts genuinely in dispute, and that Myers is entitled to the entry of partial summary judgment in its favor as a matter of law

as it relates to the issues of warranty and indemnification. Myers was found liable in the administrative hearings and in the state court for the increased costs resulting from the remedial work required due to Metromont's failure to design the roof members and connections in strict compliance with the Prime Contract. Metromont must indemnify and hold Myers harmless from these increased costs pursuant to the plain reading of the Subcontract. Further, Travelers is equally responsible to Myers under the Performance Bond up to the amount of the bond.

## II. RELEVANT UNDISPUTED FACTS

Montebello Plant 2 was a new, below-grade water reservoir structure that Myers contracted to construct pursuant to Water Contract No. 1160-R. Water Contract No. 1160-R, in turn, was a contract for the construction of a 665 ft. in the east-west direction by 490 ft. in the north-south direction cast-in-place reinforced concrete reservoir with a precast-prestressed concrete cover (the "Project"). (Stipulations of Fact,[1] ¶1; *see also* Doc. 9, ¶6 and Doc. 16, ¶6.) The structure included, among other things, a cast in place concrete slab base, cast in place concrete walls that connected to precast concrete "Double T" roof panels that are supported by precast concrete "Inverted T" Girders and cast-in-place concrete columns. The roof panels contained over 2700 connections, as called out in the contract documents. (Ex. 1, ¶8.) The Project and Water Contract No. 1160-R (the "Prime Contract") were awarded to Myers on November 18, 2009, based on a competitive bid of $36,922,950.00. (*Id.*, at ¶3; *see also* Doc. 1, at ¶10 and Doc. 9, at ¶10.)

The City of Baltimore (the "City") is the owner of the Project. (Ex. 1, ¶9.) The City contracted with Whitman, Requardt & Associates ("WRA") to serve as the "registered design

---

[1] A true and correct copy of the Stipulation of Facts that was stipulated to by Metromont through its counsel in conjunction with the below-defined Final Administrative Hearing is attached as **Exhibit 1** hereto and is incorporated herein by this reference. Metromont admitted that it did, indeed stipulate to the Stipulations of Fact in its Responses to Requests for Admissions, a true and accurate copy of which is attached hereto and incorporated by reference herein as **Exhibit 2**.

professional" in responsible charge for the Project, and WRA subcontracted with Dhillon Engineering, Inc. ("DEI") for DEI to serve as the "registered design professional" for structural design of the Project. (*Id.*, at ¶¶10-11.) Myers was the general contractor for the Project. (*Id.*, at ¶12.) Pursuant to the Project's Contract Documents, Myers was responsible for the design of the concrete roof members and connections, and it subcontracted with Metromont to perform this design and to supply the prestressed-precast inverted tee girders and double tee beams with the embedded connector plates that were used to form the roof deck for the Project. (*Id.*, at ¶13.) Myers issued a purchase order to Metromont in the original principal face amount of $4,261,611.00 (the "Subcontract"). (Doc. 1, ¶11; Doc. 9, ¶11.) At all times relevant hereto, Metromont was in the business of designing, manufacturing and delivering precast concrete products and structures. (Doc. 9,¶ 2; Doc. 16, ¶2.) Indeed, Metromont repeatedly represented to Myers that it was skilled in the design, fabrication, assembly and manufacture of precast concrete roof members and connections, (*see* Doc. 9, ¶8 and Doc. 16, ¶8), and freely admits that it knew or should have known that Myers was relying upon its superior knowledge, skill and expertise to complete the work in a good, safe and workmanlike manner. (Doc. 9, ¶48; Doc. 16, ¶48.)

Metromont submitted calculations and drawings for the design of the reservoir's roof members and connections to Myers that were signed and sealed by one of its (Metromont's) professional engineers, and on August 18, 2010, Myers submitted the same to the City in accordance with the Contract. (*See* Doc 9, ¶13; Doc. 16, ¶13; *see also* Ex. 1, ¶16.) After it designed the Project's roof members and connections, Metromont fabricated them and delivered them to the job site. (Doc 9, ¶12; Doc. 16, ¶12.) Installation of the roof deck members and connections began on or about January, 2011. (Ex. 1, ¶18.) By July 2011, however, cracking and

"spalling" of Metromont's precast concrete roof members was observed at or near their connection points throughout the roof deck. (*Id.*, ¶19; *see also* Doc. 9, ¶14 and Doc. 16, ¶14.)

Following extensive investigation, the City, Myers and Metromont all agreed that the cracking and spalling observed in the Project's precast concrete roof members was most likely attributable to "thermal forces." (Tr.,[2] at p. 90:6 – 92:2.) Metromont did not calculate thermal loads and did not take thermal forces into account in its design of the roof members and connections. (*Id.*, at. p. 93:17 – 94:10; Ex. 2, Req. No. 6.) The parties discussed and exchanged correspondence regarding methods to address the above-mentioned issues with the reservoir's roof and connections.  A method was approved by the City and Myers began making repairs to the reservoir's roof system. (Ex. 1, ¶ 20.)

The principal claim[3] Myers filed against the City is for the cost of changing a fixed, welded connection joining the "Double T" panels to a re-engineered "slip joint" connection. (Ex. 1, ¶ 21.) The slip joint connection fix required Myers and its subcontractors to perform additional work and incur additional costs beyond those originally set forth in Myers' bid and upon which its award of the Project was predicated. (Doc 9, ¶ 18; Doc. 16, ¶ 18.) On or about August 20, 2012, Myers submitted a change order request to the City, seeking an equitable adjustment of $1,993,382.56 for the additional work involved in implementing the slip joint connection fix, which it later revised on or about March 13, 2015 to a total sum of $4,699,735.91.  (Doc 9, ¶ 19; Doc. 16, ¶ 19.) At no point has Metromont ever come forward with any dispute or concern regarding the quantification of PCO 26 nor regarding whether that number represents Myers damages on account of the slip-joint connection fix. Myers' claim was denied at all levels of the

---

[2]     *See* Transcript of Final Administrative Hearing Dated November 28-29, 2017 (the "Transcript" or "Tr."), a true and correct copy of which is attached as **Exhibit 3** hereto and is incorporated herein by this reference.
[3]     The claim against the City was brought by Myers because Metromont lacked contractual privity with the City; the claim was for Metromont's use and benefit.

administrative process. (Doc 9, ¶ 21-23; Doc. 16, ¶ 21-23.) The Final Administrative Decision found that the members and connections designed, fabricated and supplied by Metromont were defective, and therefore, upheld the denial of Myers' claim for equitable adjustment. (Doc. 9, Ex. 5, p. 16.)

The Subcontract states: "[Metromont] agrees to furnish all material and all things necessary for the proper execution of this Purchase Order in such a manner as to strictly comply with the requirements of the [Prime] Contract Documents (plans and specification, including addenda)." (Doc. 9, Ex. 1, p. 1, ¶1.) The Subcontract contains a "flow-down" provision which states:

> [Metromont] acknowledges that it has had the opportunity to review fully the Contract between [Myers] and Owner and accompanying specifications and drawings, and to the extent that the said contract, specifications and drawings apply to or involve the materials to be supplied by [Metromont], [Metromont] agrees to be bound by the terms and provisions of the said contract terms, specifications and drawings as though they were physically incorporated herein.

(Doc. 9, Ex. 1, p. 5, ¶ 5.) The Subcontract further states:

> 13. **Indemnification**. **[Metromont] shall indemnify and hold harmless [Myers],** its subsidiary and affiliated companies, and all of their officers, agents and employees, **from any claim, loss, damage, liability or <u>expense</u>, including <u>attorneys' fees</u>**, on account of damage to property; injuries (including death) to any person, including [Myers'] employees; environmental damage; alleged or actual infringement of any patent rights by reason of the sale or use of any materials, equipment, device, design or apparatus furnished by [Metromont]; **and <u>any economic losses</u>, fine or penalties, <u>arising or in any manner growing out of in whole or in part the performance of any work or the supply of any materials hereunder, whether discovered before or after completion of the work</u>**…. **This indemnification obligation is not limited in any way by a limitation on the amount or type of damages**, compensation or benefits payable by or for the Purchaser or Seller under workmen's compensation acts, disability benefits acts or other employee benefits acts.

(Doc. 9, Ex. 1, p.5, ¶13 and p.7, "Indemnification") (emphasis added.)

Travelers and Metromont executed a Subcontract Performance Bond (the "Performance Bond"). (Doc 9, ¶ 9; Doc. 23, ¶ 9.) Pursuant to the Performance Bond, Travelers guaranteed the performance of the Subcontract by Metromont in the sum of $4,261,611.00. (Doc. 9, Ex. 2.) The Performance Bond requires notice of a claim be given to Travelers. (*Id*.) Notice of the instant claim was given by Myers (see Doc. 9, Ex.3) and acknowledged by Travelers. *See* Letter dated January 18, 2012, a true and accurate copy of which is attached hereto and incorporated by reference herein as **Exhibit 4**.

Metromont instituted the instant action against Myers on or about December 19, 2018, claiming Myers breached the Subcontract. On or about February 1, 2019, Myers filed a Counterclaim against Metromont, which included the following counts: Count I for breach of contract, Count II for breach of warranty, Count III for negligent design and Count IV for indemnification; on the same date, Myers filed a Third-Party Complaint against Metromont's surety, Travelers, which included Count V for indemnification.

## III. ARGUMENT

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The court views the facts in the light most favorable to the nonmoving party. *See Cherdak v. ACT, Inc.*, 437 F.Supp. 3d 442 (D. Md. 2020). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law.' A dispute of material fact is only 'genuine' if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party." *Id.* at 248-49 (internal citations omitted). In determining whether summary judgment is proper, the court may only rely on facts supported in the record, not simply

assertions in the pleadings. *Bouchat v. Balt. Ravens Football-Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003).

> **A.     Myers is Entitled to Entry of Partial Summary Judgment on Count IV for Indemnification Against Metromont Corporation.**

Under Maryland law, to recover under an express contract of indemnity, the plaintiff must show that:

> 1) There was an agreement by one party to indemnify the other party (there must have been mutual assent to the terms of the indemnity by the making of an offer by one party and by the acceptance thereof by the other party, and it must be supported by sufficient consideration); and

> 2) The occurrence which was indemnified happened (where the indemnity is liability, indemnitee must show that the liability has become fixed and established; where the indemnity is loss or damages, the indemnitee must state that he or she has made payment or suffered loss or damages).

*See Pleading Causes of Action in Maryland* § 15.6. "An indemnification agreement 'must be construed in accordance with...traditional rules of objective contract interpretation.'" *See Developers Sur. & Indem. Co. v. Belcher*, No. SAG-16-1124, 2017 U.S. Dist. LEXIS 32127, at *10 (D. Md. Mar. 7, 2017) (quoting *Atl. Contracting & Material Co. v. Ulico Cas. Co.*, 380 Md. 285 (2004)).

It is undisputed that Myers and Metromont had an express agreement of indemnity. (Doc. 9, Ex. 1, p.5, ¶13 and p.7, "Indemnification".) Pursuant to the Subcontract, Metromont agreed to indemnify Myers for "any claim, loss, damage, liability or expense, including attorneys' fees, on account of… any economic losses, fine or penalties, arising or in any manner growing out of in whole or in part the performance of any work or the supply of any materials…" under the Subcontract. (*Id.*) These terms are clear and unambiguous and must be given their plain meaning. It is also undisputed that Metromont furnished its Performance Bond – with Travelers as the surety thereon – to secure the performance of its work. (Doc. 9, Ex. 2.)

It is undisputed that Myers has suffered damages. (Doc 9, ¶¶ 18-19; Doc. 16, ¶¶ 18-19.) Myers was directed by the City to remediate the restraint issue on the roof deck by reengineering the connections and installing slip-joint connections. (Ex. 1, ¶ 20; *see also* Letter dated January 18, 2011 from the City to Myers, a true and accurate of which is attached hereto and incorporated by reference herein as **Exhibit 5**.) As the owner of the Project, the City has the authority to direct that such changes be performed. Myers submitted a change order ("PCO 26") to the City for the costs and expenses associated with remediating Metromont's deficient and defective performance. (Doc 9, ¶ 19; Doc. 16, ¶ 19.) The amount of the PCO 26 was finalized on March 13, 2015, totaling a sum of $4,699,735.91 (*id*.), which is also undisputed. (Doc. 9, ¶ 19; Doc. 16, ¶ 19; *see also* Ex. 2, Req. No. 17.)

It is undisputed that the damages suffered by Myers arose out of the work performed by Metromont on the Subcontract. (Doc 9, ¶ 18; Doc. 16, ¶ 18; *see also* Ex. 5.) Metromont was responsible for the design and fabrication of the roof members and connections on the Project. (Ex. 1, ¶ 13.) Metromont was bound by the terms of the Prime Contract. (Doc. 9, Ex. 1, p. 5, ¶ 5.) The roof members supplied by Metromont experienced cracking and spalling around the connection points. (Ex. 1, ¶19; *see also* Doc. 9, ¶14 and Doc. 16, ¶14.) Investigation into the cracking and spalling revealed that the design performed by Metromont did not accommodate movement from thermal forces as required by the Prime Contract. (Tr., at p. 90:6 – 92:2.) In fact, Metromont admitted that it did not perform any thermal load calculations in its work on the Project. (Ex. 2, Req. No. 6.) Metromont further admits that it knew thermal loads were not included on the Contract Drawings, and that it failed to request any information with which to calculate the thermal loads itself. (Ex. 2, Req. Nos. 8-9.) The City found that the roof members and connections were not designed and fabricated pursuant to the terms of the Prime Contract,

and ultimately rejected Metromont's materials and design. (Ex. 5.) The defective materials required redesign of the connections and fabrication and installation of the reengineered connections, all at Myers' expense. (Doc 9, ¶ 18; Doc. 16, ¶ 18.) Metromont refused to perform the redesign and fabrication of the new connections, forcing Myers to hire a different subcontractor to complete the remedial work. At the end of the administrative process, the Final Administrative Decision found Metromont liable for the remedial work and therefore, upheld the denial of Myers' change order. (Doc. 9, Ex. 5). The Circuit Court affirmed the Final Administrative decision. (*See* Order, a true and accurate copy of which is attached hereto and incorporated by reference herein as **Exhibit 6**.) Myers has expended over four million dollars fixing Metromont's work on this Project, which falls squarely within the Subcontract's indemnification provision; it has also expended hundreds of thousands of dollars in attorneys' fees pursuing its claim against the City, which are also recoupable pursuant to the Subcontract's Indemnification provisions and will be proven via Affidavit upon a determination of Metromont's liability under Count IV. Therefore, Metromont is responsible for indemnifying Myers for the damages it incurred, and Myers is entitled to judgment against Metromont on Count IV for Indemnification in the amount of PCO 26, $4,699,635.91, plus attorneys' fees.

**B.**     **Myers is Entitled to Entry of Partial Summary Judgment on Count V against Travelers.**

"In a performance bond context, the surety assures the obligee that if the principal fails to perform its contractual duties, the surety will discharge the duties itself, either by performing them or paying the obligee the excess costs of performance." *See Atl. Contracting & Material Co. v. Ulico Cas. Co.*, 380 Md. 285, 299 (2004). The liability of a surety is coextensive with that of the principal. *Gen. Builders Supply Co. v. MacArthur*, 228 Md. 320, 326 (1962) (citations

omitted). Therefore, the surety is immediately responsible if the principal fails to perform. *See Atl. Contracting & Material Co.*, 380 Md. 285 at 299-300.

Metromont and Travelers executed a performance bond whereby Travelers agreed to be liable to Myers should Metromont default on its obligations under the Subcontract up to the amount of $4,261,611.00. (Doc. 9, Ex. 2.) Metromont did default on its obligations under the Subcontract, as detailed more fully above. Myers put Travelers on notice of such default and instituted a claim on the performance bond on or about December 15, 2011. (Doc. 9, Ex. 3.) Myers has been found liable for the increased costs stemming from the design and installation of the slip-joint connections, which was only necessitated by Metromont's failure to strictly comply with the Prime Contract and account for thermal forces in its design of the roof members and connections. (Doc. 9, Ex. 5.) Pursuant to the performance bond, Travelers is immediately responsible if Metromont fails to perform, and therefore, Travelers is liable to Myers in the amount of the bond, $4,261,611.00.

C.     **Myers is Entitled to an Award of Pre-Judgment Interest.**

One component of Myers' damages is prejudgment interest. Under Maryland law, "prejudgment interest is allowable as a matter of right when 'the obligation to pay and the amount due had become certain, definite, and liquidated by a specific date prior to judgment so that the effect of the debtor's withholding payment was to deprive the creditor of the use of a fixed amount as of a known date.'" *East Park Ltd. P'ship v. Larkin*, 167 Md. App. 599, 624-5 (2006) (quoting *Buxton v. Buxton*, 363 Md. 634, 656 (2001)). In this case, it is undisputed that as of March 13, 2015, the amount damages suffered by Myers – $4,699,735.91 – was certain, definite, and liquidated. (Doc. 9, ¶ 19; Doc. 16, ¶ 19; *see also* Ex. 2, Req. No. 17.)

Under Maryland law, the legal rate of prejudgment interest is six percent per annum. *See* Md. Const. Art. III § 57. Therefore, as of October 26, 2020, Myers is entitled to an award of prejudgment interest in the amount of $1,586,833.48.

## IV. CONCLUSION

For the foregoing reasons, Defendant/Counter-Plaintiff/Third-Party Plaintiff Allan Myers, L.P. respectfully requests that this Honorable Court grant the instant Motion and enter partial summary judgment in its favor and against Counter-Defendant Metromont Corporation on Count IV of the Counterclaim and Third-Party Complaint and against Third-Party Defendant Travelers Casualty & Surety Company of America on Count V of the Counterclaim and Third-Party Complaint.

Respectfully submitted,

/s/ Justin B. Aronson
Curtis C. Coon, Esq. (#01275)
Justin B. Aronson, Esq. (#29034)
Brady L. Thompson, Esq. (#20096)
Coon & Cole, LLC
401 Washington Avenue, Suite 501
Towson, Maryland 21204
Direct: (410) 648-2449
Firm: (410) 244-8800
Fax (410) 825-5941
E-mail: ccc@cooncolelaw.com
E-mail: jba@cooncolelaw.com
E-mail: blt@cooncolelaw.com

*Attorneys for Defendant/Counter-Plaintiff/*
*Third-Party Plaintiff Allan Myers, L.P.*

## REQUEST FOR HEARING

Defendant/Counter-Plaintiff/Third-Party Plaintiff Allan Myers, L.P., by and through its undersigned counsel, hereby requests a hearing on the foregoing Motion pursuant to Local Rule 105.6.

/s/ Justin B. Aronson
Justin B. Aronson, Esquire

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th day of October, 2020, a copy of the foregoing **Allan Myers, L.P.'s Motion for Partial Summary Judgment, Incorporated Memorandum of Law and Request for Hearing**, was served via CM/ECF, upon:

Sidney G. Leech, Esquire
Derek M. Stikeleather, Esquire
Goodell, Devries, Leech & Dann, LLP
One South Street, 20th Floor
Baltimore, Maryland 21202
sgl@gdldlaw.com
dstikeleather@gdldlaw.com
*Attorneys for Plaintiff/Counter-Defendant Metromont Corporation*

Cynthia E. Rodgers-Waire, Esq.
Michael A. Stover, Esq.
Lisa D. Sparks, Esq.
Wright, Constable & Skeen, LLP
7 Saint Paul Street, 18th Floor
Baltimore, MD 21202
crodgers-waire@wcslaw.com
mstover@wcslaw.com
lsparks@wcslaw.com
*Attorneys for Third-Party Defendant Travelers Casualty & Surety Company of America*

/s/ Justin B. Aronson
Justin B. Aronson, Esquire