IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

METROMONT CORPORATION              :

                                   :

    v.                             :   Civil Action No. DKC 18-3928

                                   :

ALLAN MYERS, L.P.                  :

                                   :

**MEMORANDUM OPINION**

This breach of contract case was brought by Plaintiff/Counter-Defendant Metromont Corporation ("Metromont") against Defendant/Counter-Plaintiff Allan Myers, L.P. ("Myers"). Metromont asserts a single count for breach of contract. Myers filed a counterclaim, asserting four claims: breach of contract, breach of warranty, negligent design, and indemnification (with separate counts against both Metromont and third-party defendant Travelers). There are issues on which each side will have the burden of proof.

Motions are pending relating to expert witnesses on both sides. Myers has filed motions for partial summary judgment on some of its counterclaims, and Travelers responds in part with a cross-motion for summary judgment.

I.    **Expert Witnesses**

      **A. Metromont Experts**

Metromont has designated three experts: Dr. Ned Cleland ("Dr. Cleland"), Gary Klein ("Mr. Klein"), and Harry Gleich ("Mr. Gleich") (collectively, the "Metromont Experts"). Myers moves to strike designation of all three. (ECF No. 48). In the alternative, Myers moves to limit or exclude testimony by them. (ECF No. 69).

The deadline set by the court for making expert disclosures was October 7, 2019. On that day, Metromont designated Dr. Cleland, Mr. Klein, and Mr. Gleich as expert witnesses and provided Myers with a resume of each, along with transcript excerpts of each expert's prior sworn testimony during the final administrative hearing. Myers argues that such disclosures failed to comply fully with the requirements of Fed.R.Civ.P. 26 and thus must be struck in their entirety. (ECF No. 61, at 5). Fed.R.Civ.P. 26(a)(2) provides that disclosures of expert testimony must "be accompanied by a written report—prepared and signed by the witness" and must contain:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
> (ii) the facts or data considered by the witness in forming them;
> (iii) any exhibits that will be used to summarize or support them;

> (iv) the witness's qualifications, including
> a list of all publications authored in the
> previous 10 years;
> (v) a list of all other cases in which, during
> the previous 4 years, the witness testified as
> an expert at trial or by deposition; and
> (vi) a statement of the compensation to be
> paid for the study and testimony in the case.

Myers contends that the initial expert disclosures included only the witnesses' qualifications and a list of other cases in which the witnesses testified as experts. Metromont counters that the initial expert disclosures met the requirements except for being signed and including the compensation to be paid each expert. (*See* ECF No. 50, at 2) ("Th[e] testimony included the background of each expert witness, the plans, drawings, specifications, and calculations that each expert had reviewed in reaching his opinions and conclusions and his personal observations concerning the subject matter. The factual and engineering issues upon which the experts testified in the Final Administrative Hearing are the same factual and engineering issues upon which each expert is testifying in this case."). Whether all the requirements of Rule 26 were met by the original expert disclosures cannot be assessed because the transcript excerpts were not provided by either side. Regardless, Metromont provided Myers with written reports signed by each expert and meeting all of the Rule 26 requirements seventeen days later on October 24, 2019. Myers was not prejudiced by the somewhat

belated supplementation of the reports and any initial deficiencies were insubstantial.

Myers also argues that the expert designations should be struck entirely because neither the original expert disclosures nor the supplemental reports clearly set out the Metromont Experts' opinions on Metromont's standard of care and discuss only alleged errors by the city's engineers.  Myers concludes that all three reports are "wholly irrelevant" because "[w]hile this litigation stems from the same Project that was involved in Myers'[s] administrative proceedings against the City, the legal issues presented [here] . . . are different[.]"  (ECF No. 61, at 5).

This line of argument incorrectly conflates legal claims with factual issues.  The fact that the present case and the previous administrative hearings involve different parties and different legal claims does not mean that the underlying opinions expressed in one are irrelevant to the other. The two are not somehow mutually exclusive.  The opinions of the Metromont Experts, as expressed in prior testimony and in the supplemental reports produced, are relevant to the present case.  Accordingly, Myers' motion to strike Metromont's expert designations (ECF No. 48), is denied.

### 1.   Dr. Cleland

Dr. Cleland has a bachelor's degree in Civil Engineering, a master's degree in Engineering, and a Ph.D. in Engineering.  He is

licensed in the state of Maryland to practice structural engineering and is the immediate past chairman of the Precast/Prestressed Concrete Institute technical committee on parking garages. (ECF No. 75-1). Myers argues that Dr. Cleland should be precluded from testifying as to "any opinions related to construction or project management" generally and as to "any opinions related to the concept of 'design delegation'" specifically. (ECF No. 69, at 4).

Myers states that Dr. Cleland should be precluded from testifying as to construction management generally because he "admit[ted at his deposition] that he is not an expert in the field of construction management." (*Id.*). Specifically, Dr. Cleland stated in his deposition, when questioned about the possible difference between a supplier and a subcontractor, and the furnishing of a payment and performance bond, "my area is not in construction *contract* management. I don't know the process[]" and "[i]t's a project management question. I don't – we work with project managers who deal with the contractual conditions on projects and it's just not something that we do. So I can't speak to it." (ECF No. 69-1, at 119)[1] (emphasis added). Thus, Myers' characterization of the deposition testimony is misleading. What

---

[1] Deposition exhibits are presented in condensed copy format with four pages of deposition testimony printed to one page. Citations are to the deposition page not to the ECF number page.

Dr. Cleland initially states is that his area of expertise is not in construction *contract* management.   He states that he lacks expertise in dealing with contractual conditions on construction projects – a narrower subject than "construction management" broadly.

Moreover, the term "construction management" is vague and Myers does nothing to narrow the universe by pointing to specific examples of what such testimony would entail.   Thus, Metromont is "unable to respond to the issue or explain how such testimony could also apply to Dr. Cleland's expertise."  (ECF No. 75, at 5).   In fact, even Dr. Cleland makes clear that he does not know what Myers'   counsel   means   when   using   the   term   "construction management":

> Q: I believe you've already opined that you are not an expert in the field of construction management.  Is that correct?
> A: That is correct.
> Q: So while you may have certain critiques of Mr. Rauch's report, you do not intend to offer any expert opinions pertaining to the field of construction management as they relate to his report.  Is that accurate?
> A: I think that's fair . . . except to the extent if Mr. Rauch brings structural design issues into his opinions, I will address them.

(ECF No. 69-1, at 208-09).  Dr. Cleland accepts that his expertise does not extend to construction management except to the extent it involves structural design issues.   In sum, Myers' objection to Dr. Cleland's testimony regarding construction management is both

overbroad and premature.  Such objection will be addressed at trial, if necessary, at that time.  The motion to exclude Dr. Cleland's testimony as to "any opinions related to construction or project management" will be denied.

Myers states that Dr. Cleland opines in his report that there was not an effective delegation of design responsibility for the structural integrity of the roof from the structural engineers of record to Metromont.  Myers further states that Dr. Cleland relies on three sources in forming this opinion: (1) guidelines published by the Coalition of American Structural Engineers ("CASE guidelines"), (2) the International Building Code, and (3) the American Concrete Institute Code 318 ("ACI-318").  Myers argues that any opinion on design delegation is unsupported because: The International Building Code speaks only indirectly to design delegation by referencing ACI-318; ACI-318 was not a mandatory code at the time the project was entered into; the CASE guidelines are not mandatory for engineers to follow; and the CASE guidelines are unreliable or biased because Dr. Cleland helped author them. (ECF Nos. 69, at 5 and 83, at 2-3).

While Myers appears to be correct that the CASE guidelines are not mandatory and that ACI-318 was not mandatory at the time of the project, this is not dispositive.  The CASE guidelines, International Building Code, and ACI-318 may be reliable bases for the formation of Mr. Cleland's expert opinions regardless of their

mandatory nature because they are informative of the industry-wide standards of care in effect at the time of the project. As Metromont points out in its response, there is evidence that the CASE guidelines are national, have been in place since at least the early 1990's, and ultimately were codified as ACI-318. (ECF No. 75, at 3-4). The fact that Dr. Cleland was involved in authoring such guidelines, along with the several other members of The National Practice Guidelines Committee long before this case arose, does not foreclose reliance on them.

In its reply, Myers changes course and attempts to raise the new argument that "design delegation is a construction management concept, not a structural engineering concept" and thus, Dr. Cleland is unqualified to testify to design delegation. Myers' change in perspective does not change the analysis or the outcome. The motion to exclude Dr. Cleland's testimony as to opinions on the requirements of design delegation will be denied.

## 2. Mr. Gleich

Mr. Gleich holds a bachelor's degree in engineering and has thirty-seven years of experience in the precast prestressed concrete construction industry. He is currently Vice President of Engineering at Metromont Corporation. (ECF No. 48-1, at 24-25). Myers argues that Mr. Gleich states in his report that he will testify that Metromont was not a subcontractor on the project and that such testimony should be precluded because the question of

whether or not Metromont was a subcontractor with respect to the project is a legal question that is reserved for the court. (ECF No. 69, at 2). Metromont agrees, "that generally legal opinions or conclusions are inadmissible from a person who is not a legal expert" and "that it is for the Court to decide Metromont's duties and obligations under [the 2010 project contract]." (ECF No. 75, at 6).

"Testimony that 'states a legal standard or draws a legal conclusion[ ]' . . . is inadmissible." *In re Titanium Dioxide Antitrust Litig.,* No. RDB-10-318, 2013 WL 1855980, at *3 (D.Md. May 1, 2013) (quoting *United States v. McIver,* 470 F.3d 550, 561-62 (4th Cir. 2006)). In other words, "'opinions which would merely tell the [factfinder] what result to reach' are inadmissible." *Id.* at *4 (quoting Fed.R.Evid. 704 advisory committee's note); *see United States v. Offill,* 666 F.3d 168, 175 (4th Cir. 2011) (such testimony "does not help the jury . . . because it 'supplies the jury with no information other than the witness's view of how the verdict should read'" (quoting *Weinstein's Federal Evidence* § 704.04[2][a] (2d ed. 2003))).

Metromont does argue, however, that to the extent the court finds ambiguity in the language of the 2010 purchase contract and requires extrinsic evidence to determine the intention of the contracting parties, Mr. Gleich should be allowed to testify to

"whether the ambiguous language has a trade usage" in the concrete construction industry based on his thirty-seven years of experience.

The court will grant the motion to exclude Mr. Gleich's testimony on the narrow question of the *legal* relationship between Myers and Metromont, but he will not be precluded from testifying as to what the terms mean in the concrete construction business based on his years of experience in the industry.

### 3.   The Metromont Experts

Myers also argues that the Metromont Experts should be precluded from presenting evidence or testimony contrary to or inconsistent with (1) the stipulations of fact entered into by Metromont in connection with the final administrative hearing or (2) the hearing officer's determination as memorialized in the final administrative decision.  Myers cites no caselaw for this proposition.  In fact, this argument appears to attempt a backdoor argument for issue preclusion.  Issue preclusion, however, is not applicable here and the final administrative hearing has no preclusive effect in this case.  As stated in the court's earlier refusal to stay this litigation, "Metromont [was] not a party to the [] state court litigation," and "different legal issues underpin the state action and the claim pending here.  At issue in the state action is Myers' request for additional compensation for work undertaken to remediate the significant cracking and spalling

10

that occurred in the roof . . . [h]ere, Metromont seeks compensation under its subcontract with Myers." *Metromont Corp. v. Allan Myers, L.P.*, No. DKC-18-3928, 2019 WL 3253452 at *3. (D.Md. July 19, 2019).  While non-mutual collateral estoppel may be used defensively in some instances where a defendant seeks to bind the plaintiff to a prior decision to which only the plaintiff was a party, *see generally Garrity v. Md. State. Bd. of Plumbing*, 447 Md. 359, 368-69 (2016), that is not the situation here as Myers attempts to use issue preclusion offensively[2] against Metromont who was not a party to the state court case.

Myers' arguments regarding issue preclusion are irrelevant to the issue of whether the Metromont Experts may be permitted to give testimony in this case.  This question is governed solely by Fed.R.Evid. 702 which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and

---

[2] Here the use is offensive as Myers uses it as a Counter-Plaintiff to prevent Metromont from litigating this counterclaim as a Counter-Defendant.

> (d) the expert has reliably applied the
> principles and methods to the facts of the
> case.

"Courts have distilled Rule 702's requirements into two crucial inquiries: whether the proposed expert's testimony is relevant and reliable." *JFJ Toys, Inc. v. Sears Holdings Corp.*, 237 F. Supp. 3d 311, 321 (D.Md. 2017) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)). "To be relevant, the proposed expert testimony must be helpful to the trier of fact." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260 (4th Cir. 1999). Any objections raised by Myers as to the relevance and reliability of the Metromont Experts' proposed testimony has already been addressed above. Thus, the motion to exclude testimony contrary to the stipulations of fact entered into in connection with the final administrative hearing or inconsistent with the final administrative decision is denied.

**B.   Myers' Experts**

Myers has designated Robert Rauch ("Mr. Rauch") and Dr. Charles H. Thornton ("Dr. Thornton") as expert witnesses. Metromont now moves to preclude Mr. Rauch and Dr. Thornton from testifying and to strike Mr. Rauch's certificate of qualified expert. (ECF No. 71).

**1.   Mr. Rauch**

Mr. Rauch is a licensed civil engineer with forty-one years of experience managing construction projects. (ECF No. 74-2, at

12

1).  Myers engaged Mr. Rauch to certify its negligent design claim against Metromont and to testify as a professional engineer and "expert in [the field of] construction management." (ECF No. 74, at 3).  Mr. Rauch certified Myers' claim on June 12, 2019. (ECF No. 34-1, at 4).  Metromont now moves to preclude Mr. Rauch from testifying and to strike his certificate of qualified expert on the ground that, as a civil engineer, he lacks the relevant qualifications to testify in this case.  At bottom, the parties' dispute over Mr. Rauch's qualifications stem from their disagreement over the scope of the issues presented in this case.

Metromont argues that "structural engineering is at the heart of Myers' negligent design claim" (ECF No. 71-1, at 7), while Myers argues that the scope of this case extends beyond structural engineering and into the realm of construction management.  (ECF No. 74, at 3) ("While Metromont focuses solely on the structural engineering issues in this case, there are also issues of scheduling, contract ambiguities[,] and construction project management from an engineering perspective.").[3]  Because Mr. Rauch

---

[3]  Myers' reference to "construction management from an engineering perspective" corresponds to the portion of Mr. Rauch's report which discusses "Industry-Accepted Construction Management Practices." (ECF No. 74-2, at 6).  Essentially, Myers uses the term "construction management" as a short-hand reference for "the construction RFI Process" in which requests for information ("RFIs") are used to gather information that is not included within the agreements, drawings, and specifications of a project or to clarify design drawings, specifications, standards, and contract.

is a civil engineer and this is a case "that alleges 'negligent design' and faulty performance by precast-concrete structural engineers" (ECF No. 80, at 5), Metromont insists that he "is plainly unqualified to offer helpful testimony to a factfinder." (ECF No. 71-1, at 3). Myers, on the other hand, states that:

> documents produced [] in discovery [show] that Metromont was provided with a construction schedule and was aware that its materials would be exposed to the elements for a period of more than six [] months, which should have raised the alarms as to the effects of thermal forces on the roof members and connections. As a professional engineer with forty-one [] years of experience managing construction projects, Mr. Rauch is qualified to opine as to construction management issues, such as this one.

(ECF No. 74, at 3). Myers also argues that Mr. Rauch's status as a licensed civil engineer qualifies him to testify to the general standard of care applicable to all engineers. (*See id*., at 4) ("Mr. Rauch opines that Metromont breaches the duty of care for engineering—not any type of specialty engineering—by failing to design for thermal loads.")

Mr. Rauch conceded during his deposition that structural engineering is not his area of expertise. (*See generally* ECF No. 74-4, at 36, 38). He states only that he has "a working understanding of structural issues as they relate to construction" and that he "rel[ies] on other experts when it comes down to actually completing calculations and making final analysis."

14

(*Id.*, at 68).  Mr. Rauch's determination that Metromont failed to meet its standard of care instead rests on his finding that,

> the city of Baltimore and their design team provided a contract package that invited misunderstanding and design responsibility ambiguities.  These ambiguities and conflicts included, but were not limited to, design assumptions, design scope, and system performance requirements . . . the notes on the plans . . . did not include loads or forces to be applied to thermal loading design conditions as required in the specified codes.

(ECF No. 74-2, at 8).  According to Mr. Rauch, because the contract package contained ambiguities and conflicts, Metromont had a duty to resolve such ambiguities "through the use of RFIs."  (*Id.*).  Mr. Rauch fails to explain, however, why his general engineering background or his *construction management* experience qualify him to analyze the drawings, schedules, or design plans in this case or to conclude that such documents imposed any duty or obligation on Metromont.  He provides no basis for linking his education or experience with his conclusions that ambiguities existed and that such ambiguities created in Metromont a duty to inquire about thermal loads through the RFI process.  Myers' conclusion that Mr. Rauch can speak to these issues simply because he previously worked as a Director of Public Works and County Engineer supervising the construction of other wastewater facilities is not sufficient.

It remains unclear how any of Mr. Rauch's experiences inform his ability to evaluate Metromont's standard of care in the present

case.   Before he will be allowed testify to matters such as Metromont's duties and standard of care as a precast concrete engineer, there will need to be a preliminary exploration as to whether Mr. Rauch's credentials qualify him to testify.[4] Metromont's motion to exclude the testimony of and to strike the certificate of qualified expert Mr. Rauch submitted in June 2019 will be denied, although a preliminary examination of his proposed testimony will be required.

### 2. Dr. Thornton

Dr. Thornton has a Ph.D. in structural and engineering mechanics and was a practicing, licensed engineer for over forty years.  He has been involved in the design and construction of an extensive list of structures and has served as a member of several engineering committees and associations.  (*See* ECF No. 74-7, at 1). Metromont moves to preclude Dr. Thornton from testifying on the grounds that (1) his opinions are inadmissible because his professional license expired, and (2) his methodology is flawed.

---

[4] Metromont also briefly argues that Mr. Rauch attempts to testify as to legal issues such as contract interpretation, negligence, and issue preclusion/res judicata.  Mr. Rauch will not be permitted to testify as to any legal standards or conclusions at trial.  *See United States v. McIver*, 470 F. 3d 550, 562 (4th Cir. 2006) ("opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible.")

### a.  Lapsed License

Metromont first advances the incorrect argument that Dr. Thornton should be precluded from testifying because he "is no longer a licensed Maryland Professional Engineer — a clear pre-requisite to filing a certificate of qualified expert in support of a professional negligent-engineering claim." (ECF No. 71-1, at 9).  Metromont is correct that Md. Cts. & Jud. Proc. § 3-2C-02 requires filing a certificate of merit from a "qualified expert" in order to bring a negligence claim against a licensed engineer.  The statute defines "qualified expert" as "an individual who is a licensed professional, or comparably licensed or certified professional under the laws of another jurisdiction."  Md. Code Ann., Cts. & Jud. Proc. § 3-2C-01 (West).  The key fact that Metromont overlooks, however, is that Myers has not put forward Dr. Thornton to certify its negligence claim.  Rather, the record clearly reflects that Mr. Rauch, who *is* a currently licensed engineer in the state of Maryland, certified Myers' counterclaim on June 12, 2019. (ECF No. 34-1, at 2).  Because Dr. Thornton is not being used to certify Myers' claim, the fact that he is no longer licensed to practice has no bearing on the admissibility of his testimony.

### b.  Reliable Methodology

Metromont next contends that Dr. Thornton's opinions are inadmissible because such opinions rest on *ipse dixit*

proclamations rather than reliable methodology as required by Fed.R.Evid. 702. Under this rule, the district court has "a special obligation . . . to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 589 (1993)). To be considered reliable, an expert opinion "must be based on scientific, technical, or other specialized *knowledge* and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. Gen. Motors Corp.,* 190 F.3d 244, 250 (4th Cir. 1999) (citing *Daubert,* 509 U.S. at 592-93). Indeed, the Supreme Court has made clear that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). The district court enjoys "broad latitude" in determining the reliability and admissibility of expert testimony, and its determination receives considerable deference. *Kumho Tire Co.,* 526 U.S. at 142; *see also Oglesby,* 190 F.3d at 250.

Metromont argues that Dr. Thornton's opinions are unreliable because he "does not list the International Building Code, any

American Concrete Institute Code, or the PCI Design Handbook []
among the documents he reviewed in forming his opinions . . . [and
he] affirmed [this] at his deposition." (ECF No. 71-1, at 16).
Myers counters that Dr. Thornton's deposition testimony reflects
that he *did* consult ACI Code 318, PCI Design Manual, and a
reference book on exposed structures in forming his opinions and
emphasizes that Dr. Thornton's report "has an entire section
entitled 'The ACI and PCI Handbooks Confirm Metromont's
Negligence'". (ECF No. 74, at 9) (citing ECF No 74-7, at 11).

A full review of the record shows that the confusion stems
from conflicting statements in Dr. Thornton's deposition arising
from an oversight contained in Exhibit A to his report. The body
of Dr. Thornton's report expressly references ACI 318 and the PCI
Handbook. (ECF No. 74-7, at 11). Exhibit A to the report, however,
purports to contain a list of twenty-one documents Dr. Thornton
reviewed in connection with the case, and contains no reference to
ACI 318, the PCI handbook, or the IBC.

At the start of Dr. Thornton's deposition, counsel for
Metromont directed his attention to the portion of his deposition
notice instructing him to bring to the deposition all the materials
he considered in forming his opinions in the case. In response,
Dr. Thornton expressly stated that he had brought with him ACI
Code 318, the first PCI Design Manual, and the resumes and reports
of other expert witnesses in the case. He also stated that he

19

reviewed the precast concrete chapter of a book entitled "Exposed Structure in Building Design," although he did not bring the book with him as instructed.  (ECF No. 74-8, at 10-11).  Later in the deposition, however, counsel for Metromont re-directed Dr. Thornton's attention to Exhibit A to his report and asked if the documents listed were all of the documents he reviewed in preparing his opinions.  Dr. Thornton briefly replied, "Yes" and counsel immediately moved on to another topic.  (*Id.*, at 39).

Given that the text of Dr. Thornton's report explicitly discusses ACI 318 and the PCI handbook, coupled with the fact that Dr. Thornton stated under oath, at the beginning of his deposition, that he reviewed such documents and had brought them with him that day, it appears that the omission of such documents from the list in Exhibit A was simply an oversight.  Dr. Thornton is clearly familiar with both ACI 318 and the PCI handbook, and he stated that he did in fact rely on both in forming his opinions.  Likewise, the report also indicates that Dr. Thornton is both familiar with the IBC and aware of its application to this case.  Dr. Thornton's report and testimony establish that he has consulted the relevant codes and standards in forming his opinions.  In light of the record's reflection that Dr. Thornton did in fact rely on several established engineering codes, literature, and his years of engineering experience; there is no reason today to exclude his opinions.

Metromont is correct to point out, however, that Dr. Thornton makes several statements in his report that trend toward conclusory declarations.  To the extent that a given portion of Dr. Thornton's analysis during trial testimony is flimsy or lacking in proper foundation, counsel may bring that fact to the court's attention, through cross-examination and by presenting expert testimony of its own at trial.  The motion to exclude or limit Dr. Thornton's testimony is denied.

## II.  Summary Judgment

Several motions for partial summary judgment are pending. (1) Myers moves for summary judgment on its  counterclaims for indemnification (Count IV of the counterclaim against Metromont and Count V in the third party claim against Travelers) (ECF No. 67), and (2)  Myers moves for summary judgment against Metromont on count I of its counterclaim for breach of contract (ECF No. 70).  In response, Travelers cross-moves for summary judgment seeking to limit its exposure should it be found liable. (ECF No. 77).

In the first motion, Myers argues that, based on a plain reading of the contract language, Metromont must indemnify it and hold it harmless, because it was found liable in the administrative hearings and in the state court for the increased costs resulting from the remedial work required due to Metromont's failure to design the roof members and connections in strict compliance with the Prime

Contract. Further, Myers asserts that Travelers is equally responsible under the Performance Bond up to the amount of the bond. In the second motion, Myers argues that Metromont breached its Subcontract with Myers when it furnished a design for the Project's roof deck incapable of accommodating thermal forces acting on the structure, resulting in rampant cracking and spalling occurring throughout the Project and requiring Myers to incur $4.7 Million in remediation costs.

### A.   The Final Administrative Decision

Myers recites several disputed facts and arguments in a section entitled "Relevant Undisputed Facts," masquerading as a background section. Myers treats the finding in the final administrative decision as dispositive on the issue of Metromont's liability, but this argument is incorrect for multiple reasons.

First, this previous administrative decision has no preclusive effect against Metromont as a nonparty to the earlier decision. Myers never actually uses the terms issue or claim preclusion, and yet its argument, as Metromont points out, seems to be that Metromont's interests were already fairly represented on the issues before the administrative tribunal when it argues that its "claim [against the city] was for Metromont's use and benefit." (ECF No. 76, at 18) (citing ECF No. 67, at 4 n.3). As was stated in the earlier refusal to stay this litigation, however, "Because Metromont is not a party to the pending state court

22

litigation, the parties are not 'substantially the same' and staying this litigation 'would deprive [Plaintiff] of the opportunity to litigate its claim.'" *Metromont Corp. v. Allan Myers, L.P.*, No. DKC 18-3928, 2019 WL 3253452 at *3. (D.Md. July 19, 2019).

As Metromont notes, there are only rare circumstances in which non-mutual collateral estoppel is allowed because "[t]he application of claim and issue preclusion to nonparties runs up against the 'deep-rooted historic tradition that everyone should have his own day in court.'" *Taylor v. Sturgell*, 553 U.S. 880 (2008) (quoting *Richards v. Jefferson Cty., Ala.*, 517 U.S. 793, 798 (1996)). Maryland courts like *Garrity v. Md. State Bd. of Plumbing*, 447 Md. 359, 368-69 (2016), pointed to by Metromont, recognized that collateral estoppel may be used defensively where a defendant seeks to stop a plaintiff from relitigating an issue it lost in another suit. But Myers points to no caselaw that a party may invoke collateral estoppel offensively[5] to argue that an opponent, *who was not a party to a previous opinion*, is estopped from litigating an issue decided in that earlier case.

Secondly, the administrative decision actually did not find "Metromont liable for the remedial work," (ECF No. 67, at 9), but

---

[5] Here the use is offensive, as Myers uses it as a Counter-Plaintiff to prevent Metromont from litigating this counterclaim as a Counter-Defendant.

found *Myers* liable to the City as the "leaks were either the result of a clear design issue it failed to identify and report to the City, or it was the result of deficient workmanship on behalf of Allan Myers." (ECF No. 9-5, at 18).[6]  Ultimately, as Metromont argues, Myers' argument boils down to the "unsupported and legally wrong" proposition that "I win now because I lost then." (ECF No. 76, at 3).[7]  Even if this court found the administrative findings persuasive, moreover, the administrative decision still left it an open question as to who ultimately was responsible for the damage.

**B.   The Indemnity Clause**

Myers contends that its contract with Metromont has an "express agreement of indemnity" that shows, by its plain language, that Metromont is liable for the damages Myers incurred in having

---

[6] The findings also do not attempt to delineate where Myers' duty ended and Metromont's began when their joint efforts were viewed as an extension of Myers' contractual performance.  The decision states, "Allan Myers had a duty to carefully study the design drawings and provide a written report to the City if it identified improper concrete design properties as part of its initial review of the drawings and specifications.  If the leaks were the result of obvious design errors, as Allan Myers Senior Project Engineer testified, the issue should have been addressed before any concrete was poured." (*Id.*).

[7] In the face of this argument, Myers attempts to reinvent its original motion.  In both of its replies, Myers claims that summary judgment is proper without reference to *any* fact outside the record, let alone the administrative hearing, and thus "Metromont's collateral estoppel arguments are therefore completely inapposite." (ECF No. 81, at 2); (*see also* ECF No. 82, at 2).  Regardless of whether Myers has fully abandoned this line of argumentation, reliance on the administrative decision is misplaced here.

to remediate the issues with the "slip-joint connections" at its own expense.   The indemnification clause of the contract states that:

> [Metromont] shall indemnify and hold harmless [Myers] . . . from any claim, loss, damage, liability or expense, including attorneys' fees, on account of . . . any economic losses, fine or penalties, arising or in any manner growing out of in whole or in part the performance of any work or the supply of any materials.

(ECF No. 9-1, at 6).  Metromont counters that the contract language did not "require it to pay Myers for work and materials that were performed non-negligently and as required by the City." (ECF No. 76, at 20) (*citing United States for Use of B's Co. v. Cleveland Electric Co. of South Carolina*, 373 F.2d 585 (4th Cir. 1967) (Miller Act)).   Myers asserts in its reply that the language contains no "negligence requirement," as the clause requires indemnification for any losses "arising out of Metromont's performance of the work or supply of the materials."   (ECF No. 82, at 6) (*citing Cont. Heller Corp. v. Amtech Mech. Servs., Inc.*, 53 Cal.App.4th 500, 505 (1997)(California law)).

Under Maryland law, an express indemnity agreement is to be construed using the normal rules of contract interpretation. *Nat'l Labor Coll., Inc. v. Hillier Grp. Architecture N.J., Inc.*, 739 F.Supp.2d 821, 828 (D.Md. 2010).  Neither party discusses the issue under Maryland law, opting instead to rely on a single out-of-

jurisdiction authority.   This myopic approach leaves much unaddressed.   For example, if Myers contends that Metromont must indemnify it even if it, *i.e.*, Myers, was negligent, the notion would run afoul of Maryland's common law presumption:

> a contract cannot be construed to indemnify a party against its own negligence unless the contract expressly or unequivocally states that this is the parties' intent. *Bd. of Trustees, Cmty. Coll. of Balt. Cty. v. Patient First Corp.*, 444 Md. 452, 465, 120 A.3d 124 (2015). We will not interpret an agreement to indemnify a party against its own negligence absent express language or other "unequivocal terms." *Id.* at 465, 120 A.3d 124 (quoting *Crockett v. Crothers*, 264 Md. 222, 227, 285 A.2d 612 (1972)); *see also Mass Transit Admin. v. CSX Transp., Inc.*, 349 Md. 299, 309-10, 708 A.2d 298 (1998) ("Consequently, we require that there be no ambiguity and that the indemnification, if intended to embrace the sole negligence of the indemnitee, be unequivocal."). We construe the language of an indemnification provision in accordance with its customary, ordinary, and accepted meaning. *See Atl. Contracting & Material Co. v. Ulico Cas. Co.*, 380 Md. 285, 300-01, 844 A.2d 460 (2004) (citations omitted).

*Steamfitters Loc. Union No. 602 v. Erie Ins. Exch.*, 469 Md. 704, 748-49 (2020).   Until the court resolves the underlying issues, the indemnity question is premature.   Partial summary judgment on Count IV will be denied.

### C.   Breach of Contract

In its second motion for partial summary judgment, Myers argues that it is "beyond reasonable dispute" that the applicable code "mandates consideration of thermal loads and thermal forces

26

whenever a specialty engineer like Metromont designs precast concrete connections." (ECF No. 70, at 3,8) (citing ACI 350-06, § 162.2.2) ("Design of connections to minimize or transmit forces due to shrinkage, creep, temperature change, elastic deformation, differential settlement, wind, and earth-quake require special consideration in precast construction."). Metromont, Myers alleges, breached this standard as shown by its admission that it did not perform "thermal load calculation" or consider "thermal forces." (*Id.*). In its reply, Myers doubles down that ACI 350-06, the applicable code, requires "strict compliance" and argues that Metromont's failure to ensure "structural integrity" constitutes a material breach of the Subcontract. (ECF No. 81). This failure, "led to cracking and spalling plaguing the roof deck" that spawned "nearly a decade of litigation." "There is no genuine dispute as to any of the foregoing facts," Myers argues, and it is therefore "entitled to the entry of judgment in its favor . . . on Count I of its Counterclaim for breach of contract." (ECF No. 70, at 1).

Metromont argues in its response that Myers cannot hide that its motions are not really "partial" at all but rather an attempt to deliver a "knockout punch" to Metromont's "one-count claim for breach of the 2010 Purchase Order." Metromont disputes both that it agreed to "to be fully bound by Myers' dispute-resolution process" and that it "failed to perform its essential contractual obligations." The entire basis for its original claim, in fact,

is that it did perform under the contract and denies that it "performed its work negligently or with defective materials."[8]  As Metromont correctly argues, "[s]ummary judgment in a contract dispute requires much more of Myers than simply attaching a copy of the contract, invoking ACI 350-06, and declaring victory." (ECF No. 76, at 13-14, 22).

Third-party Defendant Travelers, surety to Metromont, states in its opposition to the motion for summary judgment that the contract did not obligate Metromont to install the connections where "spalling and cracking" was later observed.  The installation was done by "Myers and its subcontractors," and Metromont had no part in the "proposed design modification" or the installation of the "modified connections" that DWP required Myers to use in replacement for the original design (adding the use of "slip joint connections").  (ECF No. 77, at 4).  The implication is that Metromont cannot be held contractually liable for the overages Myers incurred in repairing the roof connections.

Travelers objects to summary judgement on Myers' Count V of its counterclaim/third-party indemnification complaint against it. Travelers points to "material disputes" on "at the very least":

> 1) the scope of Metromont's obligations under
> its purchase order; 2) whether any negligence
> or defective workmanship on Metromont's part

---

[8] While Metromont never explicitly argues that its work was in compliance with ACI 350-06, it can be inferred from this statement that it disputes such alleged noncompliance.

caused the cracking and spalling of the
materials provided by Metromont; 3) the
efficacy of the design changes, the alleged
costs for which Myers is seeking reimbursement
from Metromont and Travelers; and 4)
Myers'[s] entitlement to all of the damages
being claimed.

(ECF No. 77, at 2).  Not all these alleged disputes need to be
addressed because, as discussed above, there are clear disputes on
the first two issues involving Metromont's duties and alleged
breach under the subcontract.  Even though it is undisputed that
Travelers executed a "performance bond" whereby it would be liable
to Myers, up to $4,261,611, if Metromont defaulted on its contract,
it is entirely still in dispute whether Metromont did actually
default on this contract.

There are disputes of fact precluding the grant summary
judgment on Myers' breach of contract claim against Metromont.
Moreover, just as a reasonable factfinder could find that Metromont
did not breach its contract with Myers, so too could it by
extension find that Travelers is not liable to Myers on Metromont's
behalf.  Travelers' arguments concerning the appropriate damage
calculations if, in the alternate, Metromont is found to have
"breached its obligations under the purchase order" need not be
addressed as related to Myers' motion. (ECF No. 77, at 8-14).[9]  As

---

[9] Myers' argument that there is no "genuine issue of material
fact" as to damages stands in direct contradiction to another
argument it makes in this section.  By Myers' own admission,
Travelers provides its own calculations for damages with which

there remain underlying genuine questions of fact as to Metromont's obligations under the contract, Count V has not been proven as a matter of law, and the motion for partial summary judgment as it relates to this counterclaim will be denied.

### D.   **Travelers' Cross Motion**

In order prospectively to limit its liability, Travelers, as part of its opposition, also filed a cross-motion for partial summary judgment.   In particular, Travelers argues that Myers cannot collect against it above-and-beyond the full amount of the performance bond, $4,261,611.00, less the amount "Metromont alleges that Myers withheld [from] its contract balance of $1,015,000."   This brings the "total possible claim" against it "down to $3,684,35.01," which it argues should be further limited by the terms of the performance bond and the attendant "purchase order."   In turn, the terms of the performance bond explicitly limit recovery to "construction costs only" and Travelers' liability is further limited by (as a derivative of) the "purchase order" between Myers and Metromont itself.   On the latter front, Travelers explains that its "bonded obligation" to Metromont reveals its "concomitant exposure" – that its liability is limited

---

Myers takes exception.   (ECF No. 82, at 10-11).   This disagreement also reveals genuine issues of material fact as to damages.

to that of Metromont as the principal to the "purchase order."[10] (ECF No. 77, at 12) (citing *Ranger Constr. Co. v. Prince William Cty. Sch. Bd.*, 605 F.2d 1298, 1302 (4th Cir. 1979)).  It argues that Metromont's acceptance explicitly "amended [the purchase order] to limit Myers' remedies by excluding the provision ensuring Myers' recovery for 'loss of profits, consequential damages, and other costs, including attorneys' fees and other professional fees.'"  (*Id.*) (citing ECF No. 9-1, at 8).

As a threshold matter, Myers argues in its opposition to the cross motion that the cross motion is late and therefore should not be considered at all.  It points out that the deadline for motions for summary judgment was October 30, 2020, but Travelers did not file its cross-motion until November 14, 2020.  (ECF No. 82, at 12); (*See* ECF No. 60).  While the parties contemplated that some motions for summary judgment might be filed in advance of the bench trial, there was no requirement in the schedule (in contravention of Local Rule 105.2.c) for the parties to discuss the order of filing.  Thus, neither the parties nor the court coordinated the filing of motions by more than one party.

As with Myers' qualms with expert reports that were submitted late, such a delay does not merit exclusion.  "Although court

---

[10] In its reply, Myers "agrees with Travelers that its liability is coextensive with that of Metromont under the Subcontract." (ECF No. 82, at 11).

deadlines are not to be taken lightly or recklessly disregarded, the court has discretion to excuse minor delays." *Ground Zero Museum Workshop v. Wilson*, 813 F.Supp.2d 678 (D.Md. 2011) (denying a motion to strike Defendants' reply to a motion for summary judgment). Moreover, some of the arguments merely ask for summary judgment in Travelers' favor on the same issues raised by Myers' motion and, as pointed out by Travelers, avoiding simultaneous filings of affirmative motions for summary judgment by multiple parties is the goal of the local rule. Myers' request to strike this cross-motion will be denied.

Myers does little to refute the central points of the substantive arguments in Travelers' cross-motion. For example, Myers entirely ignores Travelers' assertion that the "Default" provision of the contract between Myers and Metromont was amended. (See ECF No. 9-1, at 8). Looking solely at the plain language of the prime contract (ECF No. 9-1, at 6), Myers argues that the "Subcontract's indemnification provision" clearly shows that "Myers is entitled to indemnification 'for any claim, loss, damages, liability or expense, **including attorneys' fees**.'" In turn, it argues, no language in the performance bonds itself limits the recovery of such fees. (ECF No. 82, at 11). There, thus, is a dispute over the precise terms of the provision.

Myers does, however, refute that, even if proven, Metromont's claim of deficient payment should be subtracted from Myers' total

32

recoverable amount against Travelers.  It argues that it is rightfully pursuing "prejudgment interest of more than $1.5 million" given that the "sum [it seeks] is a liquidated amount." This amount, Myers argues, more than offsets the amount Metromont claims due to it and ensures that the remedies it seeks are still "well in excess of the penal sum of the Performance Bond." (ECF No. 82, at 12).  Travelers counters that prejudgment interest can only be awarded against a surety when that surety "unjustly withhold[s] payment after notice of default of the principal" and the amount of the payment is not in dispute.  (ECF No. 77, at 13) (citing *Black Diamond S.S. Corp. v. Fidelity & Deposit Co. of Md.*, 22 F.2d 767 (1929)).  Travelers argues that the extensive litigation that has unfolded around this matter is proof that the "alleged damages" here "are not so certain or definite that pre-judgment interest should be assessed against Travelers." (*Id.*, at 13-14).

A definitive finding on pre-judgment interest as it relates to the performance bond is premature.  More recent caselaw in this district shows that "[c]laims that Maryland courts typically award pre-judgment interest for as matter of right involve 'bills of exchange or promissory notes,' 'actions on bonds,' and 'cases where the money claimed has been actually used by the other party." *Skanska USA Building, Inc. v. J.D. Long Masonry, Inc.*, No. SAG-16-033, 2019 WL 4260277, at *5 (D.Md. Sept. 9, 2019).  Judge

33

Gallagher has explained that, "Even if pre-judgment interest is not available as a matter of right in a breach of contract action, the trial court may award pre-judgment interest within its discretion."  *Id.*   With the obligations of the parties under the prime contract in dispute, a final determination on pre-judgment interest as it relates to the secondary liability of Travelers as a surety is premature.  Similarly, the court is unwilling to credit the well-over one million dollars Metromont claims it is owed in limiting recovery under the performance bond until the underlying contract dispute is resolved.

Whether or not interest applies, however, Travelers is correct that the plain language of the performance bonds limits Myers' recovery to "reasonable construction costs incurred" in completing "Metromont's scope of work."   (ECF No. 77, at 12) (citing ECF 9-2, ¶ 4).   The surety points to ample caselaw showing that the plain terms of a bond control in this instance.  (ECF No. 77, at 11) (citing *Levy v. Glens Falls Indem. Co.*, 123 A.348, 351 (1956) and *Inst. Of Mission Helpers of Balt. City v. Reliance Ins. Co.*, 812 F.Supp. 72, 74 (D.Md. 1992)).  While it is unclear, in a vacuum, what "reasonable construction costs" would entail here (or whether any of the current claims against Metromont might be deemed "unreasonable"), Travelers seems to seek an assurance that the damages to which it may be held liable will both not exceed the penal sum and will not include any construction overages found to

34

be objectively unreasonable.   Travelers' motion, insofar as it seeks to limit potential baseline damages to construction costs that Myers can show are "reasonably" within Metromont's scope of work, will be granted.   Such a limitation does not extend to any attorneys' fees awarded or pre-judgment interest applied to such costs, however.

> In nearly all of the cases involving bonds in which the question has arisen, it has been held or recognized that *in the absence of [an] express provision in the bond to the contrary*, attorneys' fees are not allowable over and above the penal sum stated in the bond, and this rule has been held to be applicable to the bonds of private building contractors.

L.S. Tellier, Annotation, *Allowance of attorneys' fees over and above penal sum stated in private contractor's bond*, 59 A.L.R. 2d 469 (1958) (emphasis added).   Here, whether the explicit provision allowing for recovery of attorneys' fees is incorporated into Metromont's contract is in dispute.   Foreclosing the recovery of attorneys' fees, as with ruling on prejudgment interest, is not appropriate.   Therefore, Travelers' cross-motion, insofar as it seeks to limit the addition of pre-judgment interest or attorneys' fees, above-and-beyond any base amount due under the performance bond, will be denied.   Travelers' cross-motion will be granted in part and denied in part.

                   /s/
        DEBORAH K. CHASANOW
        United States District Judge