IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

METROMONT CORPORATION

    v.

ALLAN MYERS, L.P.

:
:
:    Civil Action No. DKC 18-3928
:
:
:

**MEMORANDUM OPINION**

At the center of this case is the question of who was responsible for the failure to design the roof of the Montebello Plant 2 Finished Reservoir Project with expansion joints rather than rigid welded connections.  The original design was provided by the Owner, Baltimore City, ("the City") based on plans by its engineering design team of Whitman, Requardt & Associates ("WR&A") and Dhillon Engineering Inc. ("Dhillon").  That design, showing rigid welded connections, was incorporated into the general, prime contract that the City awarded to Allan Myers, L.P. ("Myers").  In turn, Myers contracted with Metromont Corporation ("Metromont") to supply the component parts for the roof.  Partially through construction, the City changed its mind and directed that slip

joints[1] be used instead.  Myers implemented that change and then sought additional money from the City via a change order.  After it lost in that effort, Myers not only refused to pay Metromont the full contract amount, leading to the breach of contract claim filed by Metromont, but also counterclaimed for additional sums on theories of breach of contract, breach of warranty, negligence, and indemnity, asserting that Metromont was responsible for the faulty initial design.  Myers also filed a third-party claim against Travelers Casualty & Surety Company ("Travelers") for indemnity based on its bond.  After a five-day bench trial, the following constitute the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

During the trial, the parties called witnesses, entered into stipulations, produced voluminous exhibits, and read responses to requests for admission.  The fifteen joint exhibits include the prime contract, the contract/purchase order between Myers and Metromont, the construction schedule, the Metromont submittals, the contract drawings, two Requests for Information ("RFIs"), several standards, codes, and handbooks, and stipulations of fact

---

[1] Expert testimony from Dr. Ned Cleland, on behalf of Metromont, established that slip joints and expansion joints are one and the same.

from the administrative hearing.  Several additional documents were admitted or offered.  Testifying for Metromont were "hybrid witness" Harry Gleich, fact witnesses Russell Rumley and Richard Dungan, and expert witnesses Dr. Ned M. Cleland and Gary Klein. Testifying for Myers were fact witnesses Edith Smith (via deposition), Brian Flynn, and Carmen Cipriano, and expert witnesses Dr. Charles H. Thornton and Robert D. Rauch.

Despite the size of the project, and the significant amount of money at stake, the parties essentially only litigated this case halfway.  As will be seen, their failure to recognize the essential elements of their claims dooms some of them.  Failure to produce credible evidence on other elements dooms others. Ultimately, Myers is unsuccessful on all of its claims against Metromont and Travelers, while Metromont succeeds on its breach of contract claim.

The parties rely heavily on expert testimony regarding whose responsibility it was to account for thermal forces caused by temperature changes.  Building codes and design guidelines, all the experts agree, require those designing certain types and sizes of structures to make those allowances and, while it is not entirely clear, the experts seem to agree that this structure was among those for which performing those calculations would have

3

resulted in incorporating some form of expansion joints in the roof. What was unclear at the outset was whether the responsibility for making those calculations fell to Metromont or remained with the City and its design team.

A press release issued by the City's Board of Public Works in February 2016 touted the Montebello Plant 2 project as part of an award for "Innovative Excellence in Engineering Design":

> In 2015, the City of Baltimore celebrated the Centennial of filtered drinking water in Baltimore along the shores of Lake Montebello. Our two water filtration plants at Montebello provide water to Baltimore City and surrounding counties. While both facilities have undergone upgrades over the decades, the open finished-water reservoir at Montebello 2 was deteriorated and needed to be covered to comply with the new Safe Drinking Water Act requirements.
>
> Following extensive assessment, it was determined that an entirely new finished water reservoir would need to be built. Driven by hydraulic considerations, the new reservoir would need to be constructed at the same location as the previous one. This necessitated careful consideration of construction sequencing for demolition of the old reservoir, conduits and connections to the operating water system.
>
> The new reservoir is cast in place concrete with a precast roof. It has a footprint of nearly seven acres and is divided into two separate chambers. The "green roof" consists of a waterproofing membrane, drainage board

4

and soil over precast members, so the
stormwater is largely retained on site.

Construction of the Montebello 2 Finished
Water Reservoir began in December 21, 2009 and
met EPA compliance on May 27, 2014.  The total
cost of the project was $43,578,240.

*DPW Recognized for Engineering Excellence*, Baltimore City
Department of Public Works (Feb. 19, 2016),
https://publicworks.baltimorecity.gov/news/press-releases/2016-
02-19-dpw-recognized-engineering-excellence (last visited July
29, 2021).

## I.   Facts

The prime contract was awarded by the City's Department of
Public Works to Myers in 2009 in the amount of $36,922,950.00.
(Jt. Ex. 8, ¶ 3).[2]  WR&A was the registered design professional
"in responsible charge for the project," and Dhillon was the
registered design professional for the structural design of the
project.  (Jt. Ex. 8, ¶¶ 10 and 11).

---

[2] There are three sets of exhibits:  Joint Exhibits ("Jt.
Ex."), Metromont or Plaintiff's Exhibits ("Metro. Ex."), and Myers
or Defendant's Exhibits ("Myers Ex.").

Myers entered into a fixed price contract[3] with Metromont on July 28, 2010, to make and deliver the components for the precast roof for $4,261,611, plus add-ons of $34,110, $28,804, and $14,475. (Jt. Ex. 3).  Metromont agreed to supply material (precast products for the roof, namely double tee beams and inverted tee girders, and connections)[4] and "all things necessary" "to strictly comply with the requirements of" the prime contract ("plans and specifications, including addenda").[5]  Paragraph 2F of the subcontract/purchase order  required Metromont to submit shop drawings and

> technical data/catalog cuts/samples/mix designs/lead times/fabrication . . . for approval by the Engineer and Owner prior to manufacture or delivery of any items.  This Purchase Order is contingent upon such approval; accordingly, any manufacture or

---

[3] While the parties debated whether this constituted a "subcontract" or "purchase order" throughout trial, the two terms will be used interchangeably.

[4] References to the precast, prestressed concrete "members," while pronounced the same, are referred to in writing in various forms, such as "double tees," "double T," or "TT," and called "beams," or "girders," or "members."

[5] When asked about Metromont's role, Brian Flynn, project manager for Myers at the time, said it was to supply the inverted tee girders and double tees, and all the miscellaneous hardware to make the precast roof system depicted in the contract documents between Myers and the City.  Metromont was permitted to submit alternate connection details and, if approved by the City, make them instead of those depicted on the drawings.

> delivery of items prior to Engineer, Purchaser
> or Owner approval will be at [Metromont's]
> sole risk.

Paragraph 5B states that Metromont will provide all applicable warranties required by the prime contract and, if notified of a defect, Metromont contracted to correct deficiencies.  A page of Terms and Conditions, some of which was amended, is appended to the Purchase Order.   Specific terms or conditions will be referenced as needed below.

Among the contract documents were a series of Structural Notes and Details.  (Jt. Ex. 11, S1 through S18).  On S1, the following Note appears for "Precast-prestressed concrete":

> All precast-prestressed concrete members and
> connections shown on the drawings are
> conceptual only.

> Contractor/precast-prestressed concrete mem-
> ber's manufacturer shall design the members
> and their connections in strict compliance
> with the requirements of ACI 350-06 "Code
> requirements for environmental engineering
> concrete structures" and ACI 350-3-06 for
> seismic design, for design loads indicated on
> this drawing.  Submit design and shop drawings
> for approval of the engineer.

Edith Smith was the Metromont engineer who prepared and ultimately signed and sealed Metromont's submission.   In the process, she sent a RFI to Myers dated June 11, 2010, (Jt. Ex. 12, RFI 22), concerning "Pre Cast Roof Loadings."  (The specifics of

that request, and the response, factor into opinions expressed by the experts and will be discussed later).  Metromont submitted to Myers its shop drawings and calculations on August 4, 2010, (Jt. Ex. 1), which Myers then sent to the City on August 18, 2010.  (Jt. Ex. 8, ¶ 16.)

"In September 2010, WR&A provided [Myers] . . . certain review comments . . . and ultimately returned [Metromont's] submittal to Myers with the notation "Receipt Acknowledged."  (*Id*., ¶ 17). Metromont supplied the materials and Myers began to use them to construct the reservoir roof.  Erection was done by Myers or others it hired, and not by Metromont.

In July 2011, problems were observed in the partially constructed roof with cracking and spalling[6] of concrete at various connection points, as acknowledged by many witnesses and stipulated by the parties. (Jt. Ex. 8, ¶ 19.)  Metromont suggested that high heat from the welding process at the site could be the cause and proposed a method for testing that hypothesis.

---

[6] As described by Dr. Cleland: "A spall is a chip. It's where the concrete surface is actually separated so it's rather than just being a visible crack which is a hairline or a line, it's an area of concrete that's chipped away and broken [from] the surface." (No official transcript has been prepared.  Recitations of testimony placed in quotation marks are from rough notes.)

At some point in July 2012, while the connection issue was still being resolved, a different issue was raised as to the shear load strength of some of the connections, namely the plates and embeds installed in the double tee girders, as explained in more detail below. (Jt. Ex. 8, ¶ 26). Dhillon, the structural engineer of record, performed a series of written computations that it and the City contended revealed errors in Metromont's design calculations and that called into question the strength of the double tee members, in particular whether the rebar on the underside of these members' plates was strong enough to handle the shear forces designated in the contract. In order to demonstrate that the members met the contract requirements, Metromont ran a test with the assistance of North Carolina State University ("N.C. State"), using an exemplar of the members. The City rejected the testing protocol and did not accept the results of this test as valid. Instead the City demanded that a test be setup on the site of Montebello Plant 2. Ultimately, testing was performed on April 10 and 12, 2013, with representatives from Metromont, Myers, WRA, Dhillon and the City present. The double tee ("TT") members and their connections ultimately passed the tests. (Jt. Ex. 8, ¶ 27).

As detailed more fully below, Russell Rumley reported that Metromont computed its total cost of testing to be $261,000 and

that he prepared a tally of expenses for Myers to submit to the City for reimbursement.  Mr. Rumley agreed, after discussion with Richard Dungan of Myers, that Metromont would accept payment of only $114,000 in reimbursement, if the City agreed to pay for the testing.  Metromont contends that the City approved reimbursement to Myers as part of a proposed change order ("PCO") but that it has not received any of these funds.

During the process of determining what to do about the cracking and spalling, the City provided its perspective of the structural design in a letter addressed to Myers:

> The Montebello Plant 2 Finished Water Reservoir was designed to contain water from Plant 2, up to an elevation of approximately 214.5, after which the water will overflow the weirs located on the southern side of the reservoir chambers.  Being as this is intended to be a water retaining structure with the additional requirement of being designed for a seismic event, the walls and base slab were designed without expansion joints.  This required the walls to be designed with a larger than normal amount of reinforcing steel in the walls and bottom slab, but avoided the problems associated with having separate structural units somehow tied together while maintaining the flexibility of expansion joints.  **The lack of expansion joints in the walls and slab, as well as in the precast roof, is indicative of the design intent for the project.**  For seismic action in the north-south direction, the precast prestressed concrete roof system was intended to transfer the horizontal loads from the North and South

> walls to the East and West shear walls through the welded together roof system acting as a diaphragm. The East and West walls were similarly intended to transfer the horizontal loads to the North and South shear walls for seismic action in the eat/west direction. **Thus, the precast prestressed roof was intended to be a functioning part of the entire structural system.**

(Metro. Ex. 5) (emphasis added). Ultimately, the City did not agree that heat from welding caused the cracking and spalling problem. Instead, the city and its engineers concluded that the rigid welded connections joining the "Double T" panels were at fault and that expansion joints were necessary. Thus, to resolve the issue, Myers and the City agreed to replace the rigid welded connections with slip-joints. Metromont declined to do the work. Myers hired Wallace Montgomery and Associates ("WM&A") to redesign the connections to convert them from rigid welded connections to slip joints and purchased the materials necessary to do so from Clark Machine and other material providers. Myers also hired Clark Machine and other subcontractors to grind down the welded rigid connections that had already been completed and to install the newly designed slip-joints. Myers claims $4.9 million in extra costs.

Myers submitted a change order request to the City, seeking an equitable adjustment of $1,993,382.56 for the additional work

11

involved in implementing the slip joint connections.  Myers later revised the amount, on or about March 13, 2015, to a total of $4,699,735.91.  Myers was unsuccessful in obtaining any further payment from the City for the redesigned connections.

Metromont submitted applications for payment to Myers periodically (Metro. Ex. 1), and recorded the payments received (Metro. Ex. 2).  The last invoice was dated August 7, 2012.  The last payment from Myers was received August 17, 2011, and the total remitted was $3,453,640.  Metromont calculates that $901,077.55 remains due, which is the remaining amount on the contract plus unpaid fuel surcharges.

## II.  Expert Testimony

### A.   Dr. Ned Cleland

Dr. Ned Cleland, an expert in structural engineering and precast, prestressed concrete testing, testified as a retained expert for Metromont.  His first participation in the Montebello project occurred in the fall of 2012, when it became necessary to test the strength of the structural members to determine whether they met the design specifications.  He was involved in the testing at N.C. State and was on site for the testing in April 2013.  He was able to observe some of the spalls and cracks.

12

He explained the response to RFI 22 from Dhillon and the City. When Ms. Smith asked question 3 about forces contained in note b of S-17, the response directed her attention to notes a and b. Both referred to the overall "system."  In his opinion, the overall system was designed by Dhillon and the design of the "system" was not delegated to Metromont either on the specifications or on the contract drawings.  Metromont's job was to design the connections only for the specific forces expressly delineated.   That is why Dhillon did not give the underlying information to Metromont in response to Ms. Smith's question or otherwise, because Metromont would not need it.

Delegation of design responsibility is subject to evolving standards.  According to Dr. Cleland, there are requirements in current guidelines (and in soon-to-be codes) that it must be made clear if the intent is to delegate a portion of the design to another engineer, and then the delegating engineer must provide all necessary criteria for an engineer to carry out that delegated duty to design.[7]  He did not think that the contract drawings here set forth the necessary information to delegate design duty, such

---

[7] Several witnesses referenced the tragic collapse of pedestrian walkways at a hotel in Kansas City, Missouri in July 1981 as a major impetus for the industry to focus on clarifying design delegation issues.

as the layout of the seismic design parameters, soil pressures, pressures of the walls, or temperatures.  The roof was but part of a system, and Metromont did not design that overall system.  When the drawings stated the force for which the connections must be designed, without designating the source of the force (such as "T" for thermal, "E" for earthquake, "W" for wind, "L" for live load, or "D" for dead load), Metromont could reasonably assume that all forces were included in the stated force.

According to Dr. Cleland, the use of the term "concept" or "conceptual only" in Note 1 dealt with the layout of the connections.  Metromont was free to provide "alternative connection details" to those proposed on the drawing, as long as they met the force requirements.  They had to be rigid welded connections but could be configurations that were easier for Metromont to fabricate.  Expansion, or slip, joints were not permitted.

In his opinion, the cracking and spalling that occurred were not structural defects, although they may have looked ugly.  On cross-examination, Dr. Cleland was quite critical of WRA/Dhillon, even stating that when they discovered their mistake, they decided to "find a way to get out from under the error."  They may have solved the volume change problem by changing to slip joints but

14

doing so may have compromised other aspects of the design — for example, the structure might no longer meet the requirements for a high hazard dam.

### B.   Gary John Klein

Gary John Klein, of Wiss, Janey, Elstner Associates, Inc. ("WJE"), a national engineering consulting firm, was very helpful on a number of points.  He explained that the term "conceptual" was not uncommon but was meant to delegate details, while not deviating from the concept; Metromont was allowed to vary within the concept, but not to change the concept.  Here, the concept was double tee, inverted tee, welded connections, without expansion joints.  Metromont could suggest things like moving the weld from the bottom to the top, as it did.  He did not agree with the assertion of Myers that the incorporation of codes and guides into the scope of work meant that Metromont had to consider the entire system.  He pointed out that, for example, Section 16.2.2 of ACI 350-06 is not the only portion of that code that applied to the roof.  Other portions, such as dealing with corrosion, also applied.  So, too, do other portions of the PCI design code.

### C.   Dr. Charles Thornton

Dr. Thornton, a very experienced structural engineer, provided opinions at a general, or high level.  Obviously, he said,

thermal forces due to temperature change must be a consideration in the design of any structure with precast concrete, along with creep and shrinkage.  If it was not considered in the initial design of the structure, and the error should have been obvious to any structural engineer, then WRA/Dhillon was at fault.  Moreover, according to Dr. Thornton, any fault by Metromont was secondary, and, the court understands, more from failing to raise an alarm than by providing submissions adhering to the rigid welded connection design rather than slip or expansion joints.

**D.   Robert Rauch**

Mr. Rauch has a degree in civil engineering and is a registered professional engineer in several states.  He was called by Myers as an expert in construction management, and not structural engineering, and primarily as it related to the design negligence claim.  He described the plans as a somewhat "unusual set of concept plans" in that they did include specific loads, dimensions, types of structures, and gave a fairly specific method of connection.  He also described a typical RFI process and the hierarchy for the applicability of codes.  His testimony was not particularly useful, being based at times on things that were perfectly obvious.

16

## III. The Claims

### A.   Metromont's Breach of Contract Claim

In a single count complaint, Metromont asserts that Myers breached the contract by failing to pay at least $1,015,000.00. It seeks pre- and post-judgment interest. There are two aspects to this claim: failure to pay for the component parts it delivered, and failure to pay for its out-of-pocket expenses for testing.

"Under Maryland law, to establish a breach of contract, there must be a contractual obligation owed by the defendant to the plaintiff and a material breach of that obligation." *J.E. Dunn. Constr. Co. v. S.R.P. Dev. Ltd. P'ship.*, 115 F.Supp.3d 593, 600 (D.Md. 2020) (quoting *RRC Ne., LLC v. BAA Md., Inc.,* 413 Md. 638 (2010)). Specifically, in this context:

> When a buyer breaches a contract for the sale of goods by failing to pay the purchase price, the seller may recover the purchase price as damages. [Md.Code Ann., Com. Law I] § 2-709. A court may also award the seller prejudgment interest. *See, e.g., Crystal v. West & Callahan, Inc.,* 328 Md. 318, 343, 614 A.2d 560, 572 (1992) ("The ordinary rule in contract cases, if the contract requires payment of a sum certain on a date certain, is [that] prejudgment interest typically is allowed as a matter of right.").

*Sagent Tech. v. Micros Sys., Inc.*, 276 F.Supp.2d 464, 469 (D.Md. 2003).[8]

Generally, Metromont asserts that because it fabricated the component parts of the Montebello roof according to the contract specifications and delivered them to the job site, it fulfilled its contractual duties; Myers' failure to furnish full payment for these parts is a breach of contract.  Myers undoubtedly was under a legal duty to pay Metromont for products that met the specifications of the subcontract.  The only question is whether the products did, in fact, meet those specifications.  Myers contends that Metromont did not fulfill its obligations to design the connections, labeled as "conceptual" in Note 1 on the drawings, in conformity with the codes and guidelines that mandate accommodation of thermal forces.  Metromont, in turn, contends that its obligation was to design the component parts within the concept and that it had no obligation (or even ability) to alter the design that called for rigid welded connections.

---

[8] The question of damages will be discussed below.  Any inability to prove damages would not be entirely fatal to a breach of contract claim in Maryland as Metromont would still be entitled to nominal damages.  *Nat. Prod. Sols., LLC. v. Vitaquest Int'l, LLC*, No. CCB-13-436, 2014 WL 6383482, at *6 (D.Md. Nov. 13, 2014).

1.    **Contract interpretation under Maryland law**

Generally, Maryland courts subscribe to the objective theory of contract interpretation. *Myers* [*v. Kayhoe*], 391 Md. [188,] 198 [(2006)]. Under this approach, the primary goal of contract interpretation is to ascertain the intent of the parties in entering the agreement and to interpret "the contract in a manner consistent with [that] intent." *Ocean Petroleum, Co*., 416 Md. at 88 (citing *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388 (1985)). An inquiry into the intent of the parties, where contractual language is unambiguous, is based on what a reasonable person in the position of the parties would have understood the language to mean and not "the subjective intent of the parties at the time of formation." *Ocean Petroleum, Co*., 416 Md. at 86 (citing *Cochran v. Norkunas*, 398 Md. 1, 17 (2007); *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 340 (1999) ("the clear and unambiguous language of an agreement will not give way to what the parties thought that the agreement meant or intended it to mean." (quoting *Calomiris v. Woods*, 353 Md. 425 (1999)).

Ascertaining the parties' intentions requires us to consider the plain language of the disputed contractual provisions "in context, which includes not only the text of the entire contract but also the contract's character, purpose, and 'the facts and circumstances of the parties at the time of execution.'" *Ocean Petroleum, Co.*, 416 Md. at 88 (quoting *Pac. Indem. Co.*, 302 Md. at 388). Throughout this review, we interpret a contract's plain language in accord with its "ordinary and accepted meaning[.]" *Ocean Petroleum, Co.*, 416 Md. at 88 (quoting *Fister*

> *v. Allstate Life Ins. Co.*, 366 Md. 201, 210
> (2001)).

*Credible Behav. Health, Inc. v. Johnson*, 466 Md. 380, 393–94 (2019) (string citations omitted).   If, however, the plain language analysis does not produce the answer, it may be that the contract is ambiguous:

> Contractual language is ambiguous where a reasonably prudent person could ascribe more than one reasonable meaning to it. *Calomiris*, 353 Md. at 436.   Where a court determines contractual language to be ambiguous, the narrow bounds of the objective approach give way, and the court is entitled to consider extrinsic or parol evidence to ascertain the parties' intentions. *Sullins v. Allstate Ins. Co.*, 340 Md. 503, 508 (1995).   Additionally, we have previously noted that "a term which is clear in one context may be ambiguous in another."   *Id.* (citing *Tucker v. Fireman's Fund Ins. Co.*, 308 Md. 69, 74 (1986)).

*Id.*   If the meaning still cannot be ascertained, certain tools of interpretation come into play:

> In the event of an ambiguity, however, extrinsic and parol evidence may be considered.   If no extrinsic or parol evidence is introduced, or if the ambiguity remains after consideration of extrinsic or parol evidence that is introduced, it will be construed against [ ] the drafter of the instrument.   *Pacific Indem.* [*v. Interstate Fire & Cas.*] 302 Md. [383,] 388–89 [1985]; *C & H Plumbing v. Employers Mut.*, 264 Md. 510, 512 (1972); *Mateer v. Reliance Ins. Co.*, 247 Md. 643, 648 (1967).

20

*Cheney v. Bell Nat. Life Ins. Co.,* 315 Md. 761, 766–67 (1989) (string citations omitted).

The Court of Appeals of Maryland, quoting the Court of Special Appeals, has explained that extrinsic evidence can include expert testimony in specific circumstances:

> Expert testimony will not be admitted to prove to a court or jury the proper or legal construction of any instrument of writing. Where parol or extrinsic evidence is otherwise admissible, however, in construing a contract, expert testimony is admissible to aid the fact finder in interpreting words or phrases in the instrument which have a peculiar meaning in a trade, business or profession. 31 Am.Jur.2d, Expert and Opinion Evidence, § 171, p. 736, provides:
>
> > The principles admitting opinion evidence do not permit a party to a contract to testify as to the effect of the language of the contract as he or she understood it; nor do they permit any other witness to testify as to what is meant by statements in a document prepared by another, unless the words, phrases, or statements used have some unusual or technical meaning peculiar to a certain trade, business, or

profession.  Thus, expert
testimony    cannot    be
received to prove to the
court  or  jury  what  the
proper     or     legal
construction   of   any
instrument of writing is.
If, however, words have
an   unusual   meaning   or
application in a peculiar
trade,  persons  familiar
with   such   trade   may
testify to such meaning
and  thereby  assist  the
jury    or    court    in
interpreting the written
or   verbal   passage   in
which     the     words
occur. . . .

See *Levi v. Schwartz*, 201 Md. 575, 586 (1953);
*Wash.  Fire  Ins.  Comp.  v.  Davison  and
Symington*, 30 Md. 91, 103, 104 (1869).

*Truck Ins. Exch. v. Marks Rentals, Inc.*, 288 Md. 428, 434 (1980)

(quoting *Della Ratta, Inc. v. Amer. B. Com. Dev*. 38 Md.App. 119,

131 (1977)) (erroneous quotation marks omitted).

## 2.   Application to the Metromont Purchase Order

The contract interpretation or application problem here stems

from the critical term "conceptual only" provided in a single note

in the design drawings provided to Metromont, compounded by the

massive incorporation of other documents, including construction

codes, the Green Book, the prime contract, and design drawings

provided by WRA/Dhillon.  Frankly, without the offered testimony

22

by the experts, a layperson would be unlikely to make any sense of the documents.[9]

While the court cannot rely on an expert to prove what the proper or legal construction of the writing is, it can turn to experts if a word has an unusual application in a peculiar trade. The word "concept" means, as a noun, "an abstract or generic ideal generalized from particular instances."  As an adjective, it means "created to illustrate a concept."  If something is "conceptual" it is "of, relating to, or consisting of concepts." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/concept (last visited 29 Jul. 2021).

The court has to turn to experts, however, to understand what the generic ideal was, and they all seem to recognize that the generic framework was a welded rigid roof as part of the overall system.  Even Dr. Thornton recognized that reality and said that Metromont's duty to consider thermal forces was secondary to WRA/Dhillon's, as the latter was responsible for the overall design of the structure.  He explained that the term "conceptual" would signal to anyone competent in structural engineering that the

---

[9] In fact, the purchase order is one of the few straightforward documents in this case, the terms of which a layperson could likely understand in their entirety *if* it existed as a standalone contract.

drawings were incomplete and required further calculations to make build-ready.  Based on this language and its role in creating and designing functional connections to the rooftop deck, Dr. Thornton opined that Metromont should have been aware that it was delegated design responsibility over this portion of the project, which he argued included accommodating the effect of thermal forces and volumetric change under ACI 350-06, and the effects of creep, shrinkage and temperature change under the International Building Code ("IBC"), which Metromont admits it did not consider specifically.  The court is not persuaded by his conclusion. Instead, the more compelling and logical perspective was expressed by Dr. Cleland.  He persuasively testified that while Note 1 on drawing S-1 required Metromont to comply with these codes, it did so only as to Metromont's defined scope of work.  ACI 350-06, he explained, does *not* impose on a subcontractor or material supplier the duty to review or redo the overall design of the entire roof system as supplied by WRA and Dhillon.

Mr. Klein testified that the contract drawings the City's design firms supplied clearly and unequivocally showed a roof "without expansion joints" and provided what was supposed to be an exhaustive list of exterior forces to consider in drawing S-17. Without knowing the design of the entire system, Metromont had to

24

rely on the provision of these forces within the drawings.  In reviewing the RFI submitted by Metromont's engineer, Ms. Smith, moreover, Mr. Klein said that, while she made no explicit mention of thermal forces in RFI 022, her questions were seeking information about the overall forces acting on the diaphragm and whether the maximum potential forces had been supplied, which implicitly included thermal, seismic, and wind.  She also asked for any additional information that might assist her in her project.  The response from the City and Dhillon, in turn, unequivocally communicated to Ms. Smith that what she needed to design the connections for the rooftop had already been provided to her.

Mr. Gleich admitted on cross-examination that proper calculations of these forces in light of the length of the concrete structure that Metromont manufactured would have tipped off a structural engineer on the need for expansion joints, but that Metromont was specifically told (again unequivocally) that expansion joints were *not* to be used.  This was confirmed in a letter from the City expressly stating that the overall design called for walls and base slab *without* the use of expansion joints to accommodate certain seismic pressures.  (Metro. Ex. 5).

25

The contract simply did not transfer to Metromont the duty of redesigning the roof system as (now, belatedly) claimed by Myers. Rather, its duty was to design the members and connections to fit within the concept shown on the drawings, and then, only once the City (and WRA/Dhillon) had a chance to review the Metromont submittals.  Thus, the responsibility of Metromont was to design the members and connections within the generic ideal provided by the drawings.  It was not tasked with changing the generic ideal.

Myers has not proven that second-guessing WRA and Dhillon's overall system design was within the scope of work laid out by the contract for Metromont.  Metromont has shown that it substantially performed on the contract even though it did not attempt to redesign the component parts to include expansion joints, or even highlight the deficiency of the conceptual design plans in this regard.  Metromont has carried its burden to show that it performed its contract to satisfaction.

In post-trial supplements, both parties cite to *United States v. Spearin*, 248 U.S. 132 (1918). (*See* ECF Nos. 127 and 133).  This case seems to confirm, however, that Metromont is not liable in this instance.  It reads in relevant part:

> Where one agrees to do, for a fixed sum, a
> thing possible to be performed, he will not be
> excused or become entitled to additional

26

> compensation, because unforeseen difficulties are encountered. *Day v. United States*, 245 U.S. 159 [1917]; *Phoenix Bridge Co. v. United States*, 211 U.S. 188 [(1908)]. . . . [I]f the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications. *MacKnight Flintic Stone Co. v. The Mayor*, 160 N.Y. 72 [(1899)]; *Filbert v. Philadelphia*, 181 Pa. 530 [(1897)]; *Bentley v. State*, 73 Wis. 416 [(1889)]. *See Sundstrom v. New York*, 213 N.Y. 68 [(1914)]. This responsibility of the owner is not overcome by the usual clauses requiring builders to visit the site, to check the plans, and to inform themselves of the requirements of the work, as is shown by *Christie v. United States*, 237 U.S. 234 [(1915)]; *Hollerbach v. United States*, 233 U.S. 165 [(1914)], and *United States v. Utah c. Stage Co.*, 199 U.S. 414, 424 [(1905)], where it was held that the contractor should be relieved, if he was misled by erroneous statements in the specifications. In the case at bar, the sewer, as well as the other structures, was to be built in accordance with the plans and specifications furnished by the Government.

*Spearin,* 248 U.S. at 137. Here, similarly, Metromont performed under the contract and followed the specifications provided and so cannot be said not to have performed under the contract simply because the specifications provided were themselves deficient.

### 3. Damages

Once a breach of contract is shown, the question of recoverable damages remains. Metromont's complaint requests

$1,015,000 overall, which, when the $114,000 requested for testing costs is deducted, represents a request for relief of $901,000 for those members and connections that were delivered onsite and installed, invoiced to Myers, but for which Metromont received no payment. (ECF No. 1, ¶ 26).

Under Maryland law,

> In a breach of contract action, upon proof of liability, the non-breaching party may recover damages for 1) the losses proximately caused by the breach, 2) that were reasonably foreseeable, and 3) that have been proven with reasonable certainty. *Impala Platinum, Ltd. v. Impala Sales, Inc.,* 283 Md. 296, 330 (1978); *Stuart Kitchens, Inc. v. Stevens,* 248 Md. 71, 74 (1967) (citing to RESTATEMENT (FIRST) OF CONTRACTS §§ 330, 331). In this context, "proximate cause" means losses that actually resulted from the breach. *See MLT Enters. v. Miller,* 115 Md.App. 661, 674 (1997) (stating that, whether a cause of action is in tort or contract, the plaintiff must prove that the defendant's breach of duty or contract was a proximate cause of the damages claimed).

> '[R]easonable certainty' of contract damages means the likelihood of the damages being incurred as a consequence of the breach, and their probable amount. Losses that are speculative, hypothetical, remote, or contingent either in eventuality or amount will not qualify as "reasonably certain" and therefore recoverable as contract damages. *Stuart Kitchens, supra,* 248 Md. at 74-75; *Kleban v. Eghrari-Sabet,* 174 Md.App. 60, 96, (2007).

*Hoang v. Hewitt Ave. Assocs., LLC.*, 177 Md.App. 562, 594 (2007) (string citations omitted).

    **a.   Unpaid Portion of the Purchase Order**

Here there is no guesswork involved as the unpaid portions of the purchase order are, as Myers itself concedes, a proximate result of its belief that Metromont's products were defective and its subsequent withholding of funds.  Having failed to prove these components actually were defective, Myers owes Metromont the remainder of the agreed upon purchase price, and the only question is how much.  There is no dispute that Metromont otherwise would have been paid on the outstanding invoices it submitted to Myers for construction and delivery of the component parts outlined by the fixed-price purchase agreement.

The relief requested in Metromont's complaint appears to be a rounding down of the exact amount owed and sought at trial. During testimony, Mr. Rumley relied on invoices submitted directly to Myers as billing for the manufacturing and delivery of the component parts and for fuel charges.  (*See* Metro. Ex. 1 and 2).[10]

---

[10]   Metromont Exhibit 2 was received in evidence at the time Metromont moved to admit it.  Myers thereafter renewed its objection to its admission; it explained that it had some additional questions for Mr. Rumley on how this exhibit was compiled.  Mr. Rumley conceded that he started his job with Metromont after these invoices, shown in Metromont Exhibits 1

He explained that Metromont Exhibit 1 shows the periodic applications and certificates for payment submitted by Metromont to Myers. These ultimately show a total amount billed to Myers on the fixed price contract of $4,339,000.[11] Metromont Exhibit 2, the verified statement of account, shows $3,453,630 as the total amount of payments received on this total from Myers to date.

These records accurately account for the $887,860 that Mr. Rumley asserts is due Metromont for the component parts alone. While Myers objects to Metromont's failure clearly to delineate or disclose certain inputs (shipping and engineering costs) included in the invoices, nowhere does it dispute that this is the total amount that remains owed on its purchase. In addition, Exhibit 2

---

and 2, were first generated. Myers also highlighted that Metromont would not divulge the exact shipping costs associated with these invoices and attempted (but failed) to have the witness concede that Exhibit 2 had been initially prepared as part of submitting a mechanics lien under South Carolina law. Regardless, Myers ultimately did not renew a motion to strike this exhibit on these or any other grounds.

[11] The original purchase order specified a fixed purchase price of $4,261,611.00. The purchase order, however, includes add-on costs labeled under "OPTIONS OR ALTERNATIVES" for $34,110, $28,804, and $14,475, respectively, that were accepted by Myers. (Jt. Ex. 3). When these numbers, along with a "NET CHANGE BY CHANGE ORDERS" for an additional $2,500, shown in the applications and certificates of payment, are added to this original contract price, the final $4,339,000 owed by Myers for the component parts emerges.

also attaches seven invoices for fuel surcharges, contemplated and agreed upon as part of the purchase order, (Jt. Ex. 3), that total to an unpaid balance of $13,217.  The record as a whole, therefore, confirms the total $901,077.55 "outstanding on the account" and owed to Metromont by Myers as Mr. Rumley testified to and as shown as the "Grand Total Unpaid" in Metromont's Verified Statement of Account.  (Metro. Ex. 2, at 1).

    **b.   Testing Costs**

Metromont also seeks payment for the cost of the testing that confirmed that the members met the force requirements of the specifications.  For this aspect of its claim, it must prove that the purported oral agreement reached between Mr. Dungan, on behalf of Myers, and Mr. Rumley, on behalf of Metromont, was either a modification of some underlying duty of Myers or the City to reimburse Metromont for any out-of-pocket costs of additional testing to its component parts or a standalone, binding agreement.

"To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175 (2001).  More specifically, Judge Hollander has set out the necessary proof for such a contract to be binding on the purported parties to it:

31

A contract may be oral or written, as
well as express or implied. "'An express
contract has been defined as an actual
agreement of the parties, the terms of which
are openly uttered or declared at the time of
making it, being stated in distinct and
explicit language, either orally or
in writing.'" *Maryland Cas. Co. v. Blackstone
Int'l Ltd.*, 442 Md. 685, 706 (2015)
(quoting *Cnty. Comm'rs of Caroline Cnty. v. J.
Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94
(2000)). Whether oral or written, a contract
must express with certainty the nature and
extent of the parties' obligations and the
essential terms of the agreement. *Forty W.
Builders, Inc.*, 178 Md.App. at 377-78, 941
A.2d at 1209-10; *see Canaras v. Lift Truck
Servs.*, 272 Md. 337, 346 (1974). If an
agreement omits an important term, or is
otherwise too vague or indefinite with respect
to an essential term, it is not enforceable.
*Mogavero v. Silverstein*, 142 Md.App. 259, 272,
790 A.2d 43, 50-51 (2002); *see L & L Corp. v.
Ammendale Normal Inst.*, 248 Md. 380, 385
(1968); *Schloss v. Davis*, 213 Md. 119, 123
(1957) (stating that a "contract may be so
vague and uncertain as to price or amount as
to be unenforceable").

*Kantsevoy v. LumenR LLC*, 301 F.Supp.3d 577, 594 (D.Md. 2018). "In

Maryland, '[n]o contractual duty arises when there is an

unfulfilled condition precedent to a contract.'" *Miller v.

Bristol-Myers Squibb Co.*, 121 F.Supp.2d 831, 840 (D.Md. 2000)

(quoting *Pradhan v. Maisel*, 26 Md.App. 671, 677 (1975)).

The existence of a condition precedent is
ultimately a question of construction that
depends on the parties' intent. *Azimirad v.
HSBC Mortg. Corp.*, 2011 WL 1375970, at *4

32

> (D.Md. Apr. 12, 2011) (quoting *N.Y. Bronze Powder Co.*, 716 A.2d at 233 n.2)). Although "no particular form of words is necessary in order to create an express condition, such words and phrases as 'if' and 'provided that,' are commonly used to indicate that performance has expressly been made conditional, as have the words 'when,' 'after,' 'as soon as,' or 'subject to.'" *N.Y. Bronze Powder Co.*, 716 A.2d at 233 n.2.

*Okoro v. Ocwen Loan Servicing*, No. 15-3370-JMC, 2016 WL 4555052, at *3 n.2 (D.Md. Sept. 1, 2016).

After the City questioned the strength calculations made by Metromont in the production of its double tee members and requested additional testing, strength testing was conducted both with an exemplar at N.C. State and with the actual members on site during a two-day test in April 2013, as detailed most clearly by Mr. Flynn for Myers and Dr. Cleland for Metromont, who both report witnessing the April tests, on-site. Mr. Rumley helps explain how the testing costs were cataloged. He explains that Metromont incurred particular costs associated with these tests that were recorded on invoices. He was directly involved in the review and payment of these invoices.

Mr. Rumley testified that he prepared a change order at Myers' request that detailed these costs. Mr. Rumley subsequently discussed the expenses with Myers and submitted a request for their

33

reimbursement to Myers.   This reimbursement request "[c]onsisted of expenses related to engineering fees, travel fees for two tests primarily, for engineering invoices, one related to the test at North Carolina State University and the other on-site test."  The witness reported the total cost of this testing to be $261,000, and Myers confirmed that this number was used to request reimbursement for both Myers and Metromont in PCO 51, submitted to the City in 2014.

Mr. Rumley testified that he reached an oral agreement with Mr. Dungan as Myers' authorized agent that Myers would reimburse Metromont for $114,000 of this amount **if** the City ultimately agreed to pay.  Myers does not dispute this.  Mr. Dungan testified on behalf of Myers that the City refused to pay for any of the costs associated with the testing at N.C. State, as the City never approved such a test; it did not mimic the actual conditions or dimensions of the members on site.  He admits that the City did agree to pay $110,000 for the testing in response to the change order.  $72,000 of this amount, he concedes on cross-examination, was specifically earmarked for Metromont.

Nowhere in the trial testimony did Metromont ever make clear the exact portions of the prime contract that both parties were relying on in submitting such a change order to the City.  Joint

34

Exhibit 14, however, which is PCO 51, provides that detail.  The
exhibit contains an email from January 2017 between Kevin Denny,
identified in the email as a project engineer for Myers, and City
officials that put the City on notice of a "modified" PCO 51.  It
also contains a subsequent letter sent from Mr. Cipriano to Rick
Aiken at the City, dated March 31, 2017.  This letter cites
sections 01 45 01 and 01 45 25 of the Green Book, as incorporated
into the prime contract, that clearly shift the cost of both
excavating existing portions of finished work if directed by the
Engineer as "Extra Work" and the testing of finished work to the
City.  Neither party disputes that such a duty was owed by the
City.  The 2017 letter, however, quotes the costs to Myers of
testing performed on site as $40,247.11 and the cost to the
"Subcontractor" for this testing as $76,054.36, for a total request
of $116,301.47.  (Jt. Ex. 14, at 874 and 876).  Neither party
clarifies whether this modification of its joint request to the
City came before or after the purported agreement by the City to
provide a lesser sum than originally requested.  Either way, it
presents discrepancies to the numbers presented in testimony.

Nevertheless, Myers does not dispute that the City ultimately
paid it something on this change order.  It correctly suggests
that the exact contingency outlined in the purported oral agreement

35

between Myers and Metromont — payment to Metromont of $114,000 upon full payment of the amount originally requested in the change order — was not fulfilled.  Mr. Flynn did testify, however, that $72,000 of the overall reimbursement received from the City is due to Metromont.  It is not clear that Myers disputes that this amount is owed to Metromont, only asserting that this amount, as included in any breach of contract claim by Metromont, would be more than offset by what it believes is owed to it under its counter-claims as stated in its Answer.  (ECF No. 9, at 9, "Twenty-First Affirmative Defense").  Therefore, Metromont has proven it is entitled to $72,000, but not more, on the claim for testing cost reimbursement.

### c.   Prejudgment Interest

Because Metromont proved entitlement to damages under both of its breach of contract theories, it must be determined if it is owed prejudgment interest on these amounts.  In a case based on diversity jurisdiction, prejudgment interest is a matter of state law.  *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 633 (4th Cir. 1999).

> In Maryland, there are "three basic rules governing the allowance of pre-judgment interest." *Harford Cty. v. Saks Fifth Ave. Distrib*[.] *Co.*, 399 Md. 73 (2007) (quoting

36

*Buxton v. Buxton*, 363 Md. 634, 770 A.2d 152, 165 (2001)). They are as follows:

1. Prejudgment interest *must* be granted where "the obligation to pay and the amount due" were "certain, definite, and liquidated by a specific date prior to judgment." *Buxton*, 770 A.2d at 165 (quoting *First Va. Bank v. Settles*, 322 Md. 555, 588 A.2d 803, 807 (1991)). Interest accrues from when "payment was due." *I. W. Berman Props. v. Porter Bros.*, 276 Md. 1, 344 A.2d 65, 75–76 (1975) (quoting *Affiliated Distillers Brands Corp. v. R. W. L. Wine & Liquor Co.*, 213 Md. 509, 132 A.2d 582, 586 (1957)).

2. Prejudgment interest *may not* be granted "in tort cases where the recovery is for bodily harm, emotional distress, or similar intangible elements of damage not easily susceptible of precise measurement." *Buxton*, 770 A.2d at 165.

3. Prejudgment interest *may* be granted, but is not required, in the remaining "broad category of contract cases." *Id.* In this catchall category, which is the default for contract cases, *Harford Cty.*, 923 A.2d at 13–14 (citing *Ver Brycke v. Ver Brycke*, 379 Md. 669, 843 A.2d 758, 777 (2004)), whether to order prejudgment interest "is within the discretion of the trier of fact," *Buxton*, 770 A.2d at 165.

Courts must determine whether a contract case falls under the first or third category based on their level of certainty as to the existence, amount, and due date of an obligation to pay. The rationale is that,

37

> where such certainty exists, "the effect of
> the debtor's withholding payment [is] to
> deprive the creditor of the use of a fixed
> amount as of a known date," and mandatory
> prejudgment interest is meant to rectify the
> situation. *Buxton*, 770 A.2d at 165 (quoting
> *Settles*, 588 A.2d at 807). Where the impact of
> withholding payment is less certain, the trier
> of fact has discretion to award prejudgment
> interest as appropriate to the unique
> circumstances of the case. *E.g.*, *Crystal*, 614
> A.2d at 573.

*Parkway 1046, LLC v. U. S. Home Corp.*, 961 F.3d 301, 311–12 (4th
Cir. 2020) (footnotes omitted).   In this instance, whether
mandatory or discretionary, the court finds it appropriate to award
prejudgment interest.   The fixed-price contract entitled Metromont
to payment upon performance, and the payments were withheld
improperly.   As between Metromont and Myers, it is equitable and
just to compensate Metromont for the loss of the use of that money.

Mr. Rumley testified that he had computed prejudgment
interest on Metromont's breach of contract claim using Maryland's
standard six percent interest rate.   While not expressly stated,
it is evident that he computed this amount only using the
$901,077.55 figure owed Metromont on the component parts, as the
alleged amount owed for testing costs is only made sum certain
with the issuance of this opinion (thereby rendering prejudgment
interest on those particular costs improper).   He reports using

38

the date of the last invoice issued to Myers, August 7, 2012, until May 31, 2021, a week before the start of trial, as the period in which this interest accrued.   This amounts to 3,219 days of interest on $901,077.55 which, when computed at an annual six percent interest rate ($148.12 interest/day) and rounded to the nearest whole dollar equals the $476,806 in interest reported by Mr. Rumley at trial.   This amount will be awarded to Metromont on its breach of contract claim for a total of $1,377,883.55, plus the daily amount from May 31, 2021, to today, for an additional $9,479.68 (64 additional days at $148.12 per day).   The grand total, thus, is $1,387,363.23.

### B.   Myers' Counterclaims and Third-Party Claim

Myers asserts four counterclaims against Metromont: breach of contract, breach of warranty, negligent design, and indemnification.   For all four, it seeks $4,699,735.91 in damages, plus pre- and post-judgment interest, as well as other damages, including, on the indemnity claim, attorneys' fees.   In addition, Myers' third-party complaint against Travelers for indemnity seeks $4,261,611, pre- and post-judgment interest, and attorneys' fees.

### 1.   Count I: Breach of Contract

Myers' breach of contract claim asserts that Metromont had a contractual obligation to design and furnish all component parts

in strict compliance with all of the requirements of the prime contract.  The prime contract required strict compliance with ACI 350-06.  Section 16.2.2 of ACI 350-06 mandates that when specialty engineers perform a design function, they incorporate into their designs "the forces and deformations occurring in and adjacent to connections," including temperature change (*i.e.* thermal forces). Hence, Myers claims that Metromont materially breached its contract by failing to consider and incorporate thermal loads into its design and manufacture of the concrete roof deck connections. Myers claims that "Metromont's critical omission – failing to take thermal forces into account in its design of the Project's roof deck connections, in derogation of ACI 350-06 Section 16.2.2's requirements – was the direct and proximate cause of the cracking and spalling" that occurred and that such breach resulted in damages totaling $4,699,735.91 – the amount of PCO 26 as finalized on March 13, 2015.  (ECF No. 9, at 13-19).  Myers contends this 4.6 million-dollar figure accounts for the costs and expenses associated with remediating the fixed welded connections.

As discussed above, Myers has not proven that the contract required Metromont to alter the conceptual design in that fashion, and thus its breach of contract claim fails.

2.    **Count II: Breach of Warranty**

A breach of warranty claim under Maryland law, separate from a breach of contract claim, requires a plaintiff to prove that the seller created an express warranty, the product did not conform to the warranty, and the lack of conformity caused the injury suffered. *Morris v. Biomet, Inc.*, 491 F.Supp.3d 87, 107 (D.Md. 2020). Myers' warranty claim is vague:

> Metromont expressly and impliedly warranted and represented that it was skilled in the field of designing, fabricating, assembling and manufacturing precast concrete members and connections.
>
> In undertaking to perform the design, fabrication, assembly and manufacture of the roof members and connections, Metromont expressly warranted that the roof members and connections would be free from defects in design, materials and workmanship.
>
> As a direct and proximate result of Metromont's failure to account for thermal loads in its design of the Project's roof members and connections, Metromont breached its express and implied warranties to Myers by designing, rendering and delivering to Myers defective goods, resulting in the cracking and spalling observed on and about the Project reservoir's roof.

(ECF No. 9, at 19-20).   Contrary to the allegations in the complaint, Myers has not shown that Metromont made any express warranty, other than in the purchase order/subcontract.   For

the reasons discussed in connection with Metromont's claim, Myers has not proven that any warranty in the purchase order/subcontract has been breached.

Nor is the implied warranty claim developed; the counterclaim does not even delineate whether the claim is one of merchantability or of fitness for a particular purpose:

> To recover on a claim for breach of implied warranty of merchantability, as with a strict liability or negligence claim, a plaintiff must prove the existence of a defect at the time the product leaves the manufacturer. *Ford Motor Co. v. General Acc. Ins. Co.*, 365 Md. 321, 779 A.2d 362, 369-70 (2001). Breach can be proved by showing the existence of any of the three general types of defects: manufacturing defects, design defects, or failure to warn. *Id.* at 370 n.13 (citation omitted) . . . . Conversely, a claim for breach of implied warranty of fitness for a particular purpose does not require proof of a defect. *Id.* at 376 ("[T]he warranty of fitness sharply contrasts with the warranty of merchantability, which involves an inherent defect in the goods that existed before they left the hands of the manufacturer."). A warranty of fitness claim does, however, require that the buyer have a "particular purpose" and that the seller have reason to know of that particular purpose. Md.Code Ann., Com. Law § 2-315 (2011). A particular purpose "must be peculiar to the buyer as distinguished from the ordinary or general use to which the goods would be put by the ordinary buyer." *Ford Motor,* 779 A.2d at 375 (citations omitted); *see Bond v. Nibco, Inc.,* 96 Md.App. 127, 623 A.2d 731, 736 (1993)(holding that a complaint failed to

> state a claim because plaintiff "nowhere
> alleged that he bought the [products] for a
> 'particular purpose' that in any way differed
> from the 'ordinary purpose' for which these
> [products] might be used").

*Grinage v. Mylan Pharms., Inc.*, 840 F. Supp. 2d 862, 871 (D.Md. 2011). Myers has failed to support sufficiently any warranty claim, be it express or implied.

### 3.   Count III: Negligent Design

The negligent design claim requires proof of a duty owed by Defendant to Plaintiff, a breach of the standard of care applicable to other like professionals similarly situated, and damages. *Shofer v. Stuart Hack Co.*, 124 Md.App. 516, 529 (1999). Myers' counterclaim asserts that the duty owed to it was imposed **by contract** and "all applicable customs and laws governing contractors to perform the work in good and workmanlike manner, and in full compliance with the Prime contract, plans and specifications pertaining to the Project." (ECF No. 9, at 21). It also asserts that "Metromont had a duty to perform its work in accordance with the standards of care recognized and ordinarily employed by reasonably prudent, licensed commercial contractors," and a duty to perform its work in accordance "with the heightened standards of care recognized and ordinarily employed by reasonably prudent professional engineers in Maryland in conjunction with

43

projects of similar magnitude and complexity as the Project."
(*Id.*).  Other than conclusorily alleging that Metromont breached
all of those duties, the counterclaim alleges that the negligent
acts and omissions included "failure to calculate thermal loads in
its design of the Project's roof members and connections, as
required by ACI 350-06 and made applicable to the Project via the
Prime Contract." (*Id.*, at 22).  As discussed above, Myers has not
proven that Metromont's role included altering the rigid welded
concept for the roof and thus has not proven any breach of the
standard of care.  The design negligence claim fails.

### 4.   Count IV: Indemnification against Metromont

Myers contends that "Metromont owed Myers a contractual duty
to indemnify Myers for any claim, loss, damage, liability or
expense (including attorneys' fees) on account of damage to
property, and any economic losses arising out of the performance
of any work or the supply of any materials in connection with the
Project." (ECF No. 9, at 23).  Furthermore, Myers alleges that
the increased costs due to the mid-stream conversion to slip-
joints "was only necessitated by Metromont's failure to strictly
comply with the Prime contract and account for thermal load forces
in its original design of the Project's roof members and
connections." (*Id.*)

44

The contract between Myers and Metromont, in ¶ 13 of the Terms and Conditions, contains the indemnification clause:

> Indemnification. [Metromont] shall indemnify and hold harmless [Myers], its subsidiary and affiliated companies, and all of their officers, agents and employees, from any claim, loss, damage, liability or expense, including attorneys' fees, on account of damage to property; injuries (including death) to any person, including [Myers'] employees; environmental damage; alleged or actual infringement of any patent rights by reason of the sale or use of any materials, equipment, device, design or apparatus furnished by [Metromont]; and any economic losses, fine or penalties, arising or in any manner growing out of in whole or in part the performance of any work or the supply of any materials hereunder, whether discovered before or after completion of the work.... This indemnification obligation is not limited in any way by a limitation on the amount or type of damages, compensation or benefits payable by or for the Purchaser or Seller under workmen's compensation acts, disability benefits acts or other employee benefits acts.

Under Maryland law, an express indemnity agreement is to be construed using the normal rules of contract interpretation. *Nat'l Labor Coll., Inc. v. Hillier Grp. Architecture N.J., Inc.*, 739 F.Supp.2d 821, 828 (D.Md. 2010). The Indemnification provision in the purchase order limits Metromont's obligation to cover losses to those arising out of "the performance of any work or the supply of any materials" by Metromont.

> In construing the phrase "arising out of the
> Contract Service," we apply the definition set
> forth in *Northern Assurance Co. v. EDP Floors,*
> 311 Md. 217, 230 (1987). In that case, the
> Court determined that the "words 'arising out
> of' must be afforded their common
> understanding, namely to mean originating
> from, growing out of, flowing from, or the
> like." *Id.* at 230; *see also* 12 Couch on
> Insurance 2$^d$ § 45:61 (rev. ed. 1981) ("arising
> out of" generally means originating from,
> growing out of, or flowing from); 6B Appleman,
> Insurance Law and Practice § 4317, at 360-63
> (Buckeley ed. 1979) (in automobile insurance
> context, words arising out of have "broader
> significance than words 'caused by' and are
> ordinarily understood to mean originating
> from, incident to, or in connection with the
> use of the vehicle"). In addition, in
> Maryland, it is well established that the
> words "arising out of" require a showing of a
> causal relationship, although "recovery is not
> limited to the strict rules developed in
> relation to direct and proximate cause."
> *National Indemnity Co. v. Ewing,* 235 Md. 145,
> 149-50 (1964); *see Frazier v. Unsatisfied
> Claim & Judgment Fund Bd.,* 262 Md. 115 (1971);
> *McNeill v. Maryland Ins. Guar. Ass'n,* 48
> Md.App. 411 (1981); *see also* 1 Rowland H.
> Long, The Law of Liability Insurance, § 1.22,
> at 1-57 (1972) ("The phrase 'arising out of'
> is not to be construed to mean 'proximately
> caused by.'... The words 'arising out of' mean
> causally connected with, not 'proximately
> caused by' use.").

*CSX Transp., Inc. v. Mass Transit Admin.*, 111 Md. App. 634, 640-41 (1996), *aff'd,* 349 Md. 299 (1998) (footnotes and string citations omitted). Thus, to succeed on the indemnification claim there must be, at least, some causal relationship between the work

46

performed or materials supplied by Metromont and the loss claimed. That is, Metromont's conduct actually must have produced the loss. *See Pittway Corp. v. Collins*, 409 Md. 218, 244 (2009) ("Causation-in-fact concerns the threshold inquiry of 'whether defendant's conduct actually produced an injury.'(citations omitted). Two tests have developed to determine if causation-in-fact exists, the but for test and the substantial factor test."). Here, Myers has not proven that Metromont's performance produced the loss, because, as the discussion above concludes, Myers has not proven that the remediation effort was the result of Metromont's work, as opposed to the City's change of heart. This claim fails.

### 5. Count V: Indemnification against Travelers

Myers' claim against Travelers is contingent on proving that Metromont "defaulted" under the subcontract. This claim fails as well, for the very basic reason that Myers has not proven that Metromont defaulted.

### 6. A note on damages claimed by Myers

Even if Myers somehow had proven that Metromont was liable, it utterly failed to prove a proper measure of damages. Its sole attempt relied on Myers Exhibit 1, PCO 26. Ultimately, it moved to admit only the first four pages of the exhibit — which purport to contain the total costs Myers incurred during what is alleged

47

to be a delay in the project caused by Metromont.  It relied on two different grounds for admitting PCO 26: that these "summary" pages of this exhibit constitute either 1) a business record kept in the regular course of business, and thus admissible under Fed.R.Evid. 803(6)(A), or 2) a summary of voluminous records under Fed.R.Evid. 1006.  These pages, while possibly based in part on business records, are not themselves a business record, are not a summary, are not accurate, and fail to establish any proper measure of damages.

This so-called "change order summary," compiled by Mr. Cipriano, does not meet the criteria to be considered a record created in regular course of business.  Judge Gauvey has clearly laid out the considerations for whether something falls within the business records exception of Rule 803:

> Federal Rule of Evidence 803 provides that, "regardless of whether the declarant is available as a witness," certain records of a regularly conducted activity "are not excluded by the rule against hearsay."  Fed.R.Evid. 803(6).  Commonly referred to as the business records exception, 803(6) applies to a "record of an act, event, condition, opinion, or diagnosis" if five requirements are met. First, the record must be "made at or near the time by—or from information transmitted by—someone with knowledge."  *Id*. 803(6)(A). Second, the record must be "kept in the course of a regularly conducted activity of a business, organization, occupation, or

48

calling, whether or not for profit." *Id.*
803(6)(B). Third, "making the record [must
be] a regular practice of that activity." *Id.*
803(6)(C). Fourth, the first three
requirements must be "shown by the testimony
of the custodian or another qualified witness,
or by a certification that complies with Rule
902(11) or (12) or with a statute permitting
certification." *Id.* 803(6)(D). Fifth, the
exception will only apply if "neither the
source of information nor the method or
circumstances of preparation indicate a lack
of trustworthiness." *Id.* 803(6)(E).

As the Advisory Committee explains, business
records are presumed to be unusually reliable
as the product of "systematic checking, by
regularity and continuity which produce habits
of precision." Fed.R.Evid. 803 Advisory
Committee Note. Moreover, "businesses depend
on such records to conduct their own affairs;
accordingly, the employees who generate them
have a strong motive to be accurate and none
to be deceitful." *Doali-Miller v. SuperValu,
Inc.,* 855 F.Supp.2d 510, 516 (D.Md. 2012)
(quoting *Certain Underwriters at Lloyd's,
London v. Sinkovich,* 232 F.3d 200, 204–05 (4th
Cir. 2000)). Simply put, "routine and
habitual patterns of creation lend reliability
to business records." *Id.* (quoting *Sinkovich,*
232 F.3d at 205).

*Webster v. ACB Receivables MGMT, Inc.*, 15 F.Supp.3d 619, 631 (D.Md.

Apr. 22, 2014).

Mr. Cipriano compiled this "summary" primarily from two

sources: so-called direct costs reports and force account sheets.

The direct cost reports were created by Myers as a matter of

routine after every day of work on site and simply noted the

49

various forms of costs to Myers as the general contractor at the jobsite.  The force account sheets, on the other hand, also were created daily on site by the City in consultation with Myers, but only for "change order work."  Mr. Cipriano admitted that he was not on site at the time the majority of the force account sheets were generated, but notes that they were created under the supervision of both a City representative and Myer's employee, who both signed to denote their accuracy at the end of every work day and contemporaneously with the conditions (personnel and pay) that these third parties were observing.

Creation of the summary itself, however — the only document that Myers attempts to enter into the record — was something that Mr. Cipriano was *asked* to create in light of the change order requested by the City.  It came, not as part of the regular course of business (despite the witnesses' claim that it did) but as part of a "request for equitable adjustment" submitted by Myers to the City.  Moreover, Mr. Cipriano testified that he followed the "customary procedure" in creating this summary as would be followed in light of *any* change order, but he admits that it involved a large amount of discretion on his part, particularly when the daily cost reports and force account sheets were at odds.  Specifically, there were often discrepancies between the City's force account

50

sheet and the direct cost report on a given day, some of which were quite large as revealed during cross-examination, and Mr. Cipriano testified that he used his best judgment as to which document reported the costs more accurately. For example, if he noted that the force account sheet reported the wage for someone who wasn't actually "on the job" that day, he would instead defer to the daily cost sheet.

At least at times, Myers chose to accept and report a much higher number of work hours as reported on its own direct cost reports, and discredited and disregarded the lower number of work hours reported on the force account sheets prepared by the City, despite having reviewed and signed off on the latter at the end of each work day. In one instance in particular, Mr. Cipriano deemed the direct cost report more accurate and used the labor it logged, even though it reported *twice* as many hours worked on site as the force account sheet for that day. Moreover, certain direct cost sheets contained handwritten notes appearing to disagree with certain logs, but the witness was unable to say whose handwriting it was or whether he inquired into said disagreement. This was because Mr. Cipriano did not generate or have personal knowledge of many of the underlying reports, but merely reviewed them after the fact. There were also at least six days in that period for

51

which a force account sheet could not be found at all, as well as days for which the underlying documentation supporting the daily cost reports, such as the daily job control reports, were entirely missing.

Mr. Cipriano also testified that he relied on various invoices submitted by and payments made to third parties for services on site; these are included along with the force account sheets and direct costs reports as "backup" documentation to the purported "summary" of costs.

This is decidedly not the kind of routine business record that carries clear indicia of reliability.  Myers did not rely on such a summary to conduct its business day in and day out.  Instead, it was used by Myers to petition the City for reimbursement for extra and unanticipated costs on the project and for the purported benefit of Metromont.  As such there was a clear perverse incentive to overreport work hours, which is borne out by the fact that Mr. Cipriano often chose the higher of two total work hours when presented with contradictory data.  The discrepancies that such reporting uncovered are indicia that, in fact, this record cannot be relied on for its intrinsic accuracy.  As Mr. Cipriano did not have personal knowledge of how the underlying "backup documentation" was generated, "neither the source of information

52

nor the method or circumstances of preparation" indicate trustworthiness. Finally, such a document created only for the narrow purpose of trying to recoup costs from the City cannot be said to be a "regular" practice of Myers' business, despite the fact that Mr. Cipriano reports having created such a reconciliation of costs "thousands of times." This document cannot qualify as a business record.

Alternatively, Judge Williams has explained when a summary of voluminous records is admissible into evidence and sheds light on why this exhibit does not qualify:

> In relevant part, Rule 1006 states: "The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation." FED. R. EVID. 1006. "Rule 1006 charts . . . are admitted into evidence as a surrogate for voluminous writings that are otherwise admissible." *United States v. Janati*, 374 F.3d 263, 273 (4th Cir. 2004). "In this respect, Rule 1006 summary charts are distinguishable from other charts and summaries that may be presented under Federal Rule of Evidence 611(a) to facilitate the presentation and comprehension of evidence already in the record." *Id.* As such, Rule 1006 summaries should not include witnesses' conclusions or opinions. *See id. See also Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1159-60 (11th Cir. 2004) (citing *United States v. Smyth*, 556 F.3d 1179, 1184 n.12 (5th Cir. 1977)) ("[B]ecause 'summaries are elevated under Rule 1006 to the position

> of evidence, care must be taken to omit
> argumentative matter in their preparation lest
> the jury believe that such matter is itself
> evidence of the assertion it makes.'").

*Bluiett v. Pierre M. Sprey, Inc*. No. AW-05-1244, 2009 WL 10685350,
at *4 (D.Md. Jan. 27, 2009).

These pages are not a summary for many of the same reasons
they are not regular business records. While the various records
purporting to detail the entire universe of costs associated with
what Myers sought for delay to the project caused by Metromont are
certainly voluminous, the so-called "summary" compiled and
prepared by Mr. Cipriano using these documents introduces a level
of opinion and analysis that render the document inadmissible as
a pure summary of the "backup" documentation.

The "summary" also includes hours worked by those in
"supervisory" positions (project engineer, project manager, etc.)
that is not reflected *at all* in the direct cost reports, and the
witness admitted he was not in possession of payroll records to
support such costs. It was further revealed in testimony that the
numbers purported to be invoices obtained from individual vendors
actually are calculated using their average cost instead of what
was actually billed. Finally, despite the fact that the direct
cost reports showed, in total, hundreds of hours worked more than

54

was recorded on the force account sheets, Mr. Cipriano admits that he did no analysis at the time to try fully to reconcile this vast difference in reporting.   In light of all of this, as the court aptly noted during testimony, "this is not a summary."   Even ignoring the variety of discrepancies and missing "backup documentation," the "summary," by its author's own telling, involved a large amount of guesswork and judgment calls that incorporate the witness's opinion and conclusions to such an extent that this record cannot qualify as a form of admissible evidence under Fed.R.Evid. 1006, either.

Thus, Myers produced no reliable evidence of damages.   The proposed exhibit is not admissible.   Even if it were, moreover, the court would find it unreliable and insufficient to provide a proper measure of damages.   Even if Myers was able to prove the myriad expenses it claims to have incurred during the purported delay, it has not shown that such damages are the "proximately caused" by the purported breach.   *Hoang*, 177 Md.App. at 592 (quoting, among others, *Impala Platinum, Ltd.* 283 Md. at 330). More specific to delay costs, Myers has not shown that the overhead costs included in the change order request to the City could not be reabsorbed or redeployed by it for other purposes.   *See Wickersham Constr. And Eng'r, Inc.*, No. CCB-16-4087, 2020 WL

55

5642106, at *7, *9 (D.Md. Sept. 22, 2020) (denying a plaintiff contractor's request for "underabsorbed overhead" attributable to a project delay, despite its provision of expert testimony and his "time impact analysis" that purported to show which delay costs were attributable to each party and to prove, among other things, that the defendant town had forced the contractor to "stand by" and that it was "unable to take on other work" during this time).

## IV.  Conclusion

For the foregoing reasons, the court finds in favor of Metromont on its breach of contract claim, and against Myers on all of its counterclaims and third-party claim.  A separate Order of Judgment will be entered.

<pre>
                                    /s/
                            _____
                            DEBORAH K. CHASANOW
                            United States District Judge
</pre>